## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                    SUPERIOR COURT

RACHEL CULLINANE and )
JACQUELINE NUNEZ, *on behalf* )
*of themselves and others similarly situated,* )     Case No.   14-3505 BLS
)
     Plaintiffs, )
)
v. )
)     Jury Trial Demanded
UBER TECHNOLOGIES, INC., )
)
     Defendant. )
)
)

### CLASS ACTION COMPLAINT

### Introduction

1.     Uber is a "ride sharing" service that transports customers throughout the Boston area for a fee. Uber passengers summon Uber vehicles using a cell phone app, and pay the fare through the same app.

2.     UberX, UberBLACK and UberSUV vehicles transporting passengers to and from Logan Airport charge a fare, and an additional $8.75 fee for a so-called "Logan Massport Surcharge and Toll."

3.     For airport drop-offs, there is no such thing as a "Massport Surcharge." Neither Massport nor Logan impose a fee, charge or "surcharge" of any sort upon Uber vehicles dropping passengers off at Logan Airport.

4.     And the "Massport Surcharge" is inflated for pick-ups. Only Massport permitted transport providers can pick passengers up at Logan. Such

licensed livery services, some of which are accessible using Uber, pay a $3.25 fee for Logan pick-ups – not $8.75 - but that is the only "Massport surcharge" applicable to Uber vehicles picking up at Logan.

5.       This class action seeks declaratory, injunctive and monetary relief on behalf of a class of Uber passengers in Massachusetts who paid these fictitious and inflated fees.

## Parties

6.       Ms. Nunez is an adult residing in Suffolk County.

7.       Ms. Cullinane is an adult residing in Suffolk County.

8.       Uber Technologies, Inc. is a California corporation with its principal place of business in San Francisco, California.

## Jurisdiction and Venue

9.       This Court has jurisdiction to grant the relief sought under M.G.L. c. 214, §§ 1, 5; c. 212, § 3, and c. 231A, § 1.

10.       Venue lies in this county because Ms. Nunez and Ms. Cullinane reside here and Uber does business here.

## Facts

**Uber's Download and Registration Process Obscures The Terms & Conditions Uber Imposes On Its Customers**

11.       Ms. Nunez downloaded the Uber app on her iPhone and created an Uber account on or about January 1, 2013.

12.       Ms. Cullinane downloaded the Uber app on her iPhone and created

an Uber account on or about April 1, 2014.

13.     Both Ms. Nunez and Ms. Cullinane followed the registration

process to create an Uber account. This process required each plaintiff to input

identifying information on a screen on her mobile device, and provide a credit

card account number.

14.     On touchscreen devices like the iPhone an electronic keyboard

obscures the lower half of the screen as information is inputted into each

required field: email address, mobile telephone number, password, first and last

name, and credit card account information.



15.     As each plaintiff provided the information in the required fields,

the lower halves of their screens were obscured by the electronic keyboard.



16.    At the conclusion of the registration process, the app displayed a

screen to each plaintiff, the bottom of which referenced a hyperlink to Uber's

"Terms & Conditions and Privacy Policy."



17.    At no step during the registration process were the referenced

"terms & conditions" displayed to Ms. Cullinane or Ms. Nunez.

18.     Nor did Uber's registration process require, either as a condition of initially using its app or its ride share service, that either plaintiff access the "terms & conditions" hyperlink, read the "terms & conditions", or affirmatively assent to them.

19.     Neither plaintiff accessed the "terms & conditions" hyperlink, read the "terms & conditions", or affirmatively assented to them.

**Uber's Terms & Conditions Attempt To Abrogate Basic Legal Rights**

20.     Each prospective Uber user must register and create an Uber account using the same steps and viewing the same screens as Ms. Cullinane and Ms. Nunez.

21.     Uber's inconspicuous "terms & conditions" contain a number of grossly one-sided provisions, which purport to contract away all possible legal obligations to its customers, including even any obligation to provide a safe vehicle, or a safe driver, while retaining its right to payment regardless of whether a ride is completed.

22.     Uber's "terms & conditions" contain a complete disclaimer of warranties, which disavows virtually every conceivable basis upon which a reasonable user would rely in using the app and the ride share service:

> The company makes *no representation, warranty, or guaranty* on the reliability, timeliness, quality, suitability, availability, accuracy or completeness of the service or application. ....

The service and application is provided to you *strictly on an "as is" basis. All conditions, representations and warranties*, whether express, implied, statutory or otherwise, including, without limitation, any implied warranty of merchantability, fitness for a particular purpose, or non-infringement of third party rights, are *disclaimed to the maximum extent permitted by applicable law* ....

You acknowledge and *agree that the entire risk* arising out of your use of the application and service, and any third party services or products *remains solely with you*, to the maximum extent permitted by law.

(Emphases added).

23.     Uber's "terms & conditions" contain a "no refund" policy, encompassing "[a]ny fees that the Company may charge you...." This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, *or any reason whatsoever*" (emphasis added).

24.     Uber's "terms & conditions" contain a Liability Disclaimer, by which Uber purports to absolve itself of all liability arising out of using its app or ride share service.

25.     Uber imposes upon every UberX passenger a $1 "Safe Rides Fee." Uber expressly represents that this Safe Rides Fee "supports our continued efforts to ensure the *safest possible platform for Uber riders* and drivers, including an *industry-leading background check* process, regular motor vehicle checks, driver safety education, development of *safety features in the app*, and insurance. For complete pricing *transparency*, you'll see this as a separate line item on every

UberX receipt" (emphases added).

26.     Despite its express representation that it is "committed to connecting you with the safest rides on the road," Uber disclaims *"any and all any liability... in any way related to the third party transportation provider...."* (emphasis added).

27.     Although it expressly represents that it employs an *"industry-leading background check* process," Uber disclaims any responsibility to *"assess the suitability, legality or ability of any [drivers]"* (emphases added).

28.     Although expressly representing that it conducts "regular motor vehicle checks [and] driver safety education," Uber's "terms & conditions" disavow any responsibility for the rider's safety: *"You understand,* therefore, that by using the application and the service, *you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe* or otherwise objectionable, and that *you use the application and the service at your own risk"* (emphases added).

**In Contrast, Uber's Surge Pricing Clearly Discloses Terms And Requires Customers To Affirmatively Agree To Those Terms**

29.     In contrast to the passive "terms & conditions" disclosure, which does not require the customer's affirmative assent to those terms, Uber informs the customer before imposing any charges that surge pricing will be applied. Uber discloses the amount of the surge pricing surcharge, and requires the customer to affirmatively agree to that surcharge before it acknowledges that an agreement on those terms has been reached between the customer and Uber.

30.     Uber's stated purpose for this multi-step process is that it wants to

ensure that these contract terms are "clear and straightforward."

http://blog.uber.com/2012/12/28/surge2012/

31.     Uber illustrates this three step process on its website.

  

32.     By using this "clear and straightforward" disclosure process,

coupled with requiring the customer's affirmative election to accept the disclosed

terms, Uber hopes to ensure that, at least with respect to its surge pricing, its

customers "won't be surprised" by the terms of its contract.

http://blog.uber.com/2012/12/28/new-years-eve-2012/#QA

**Facts Pertaining To Ms. Nunez's Uber Transaction**

33.     On September 13, 2013, Ms. Nunez used the Uber app to obtain

transportation to Logan Airport.

34.     Ms. Nunez paid $65.00 for the trip to the airport, including the $8.75 "Logan Massport Surcharge & Toll."

35.     Uber itemized its charges as follows on the electronic invoice it sent to her via the app:



**Facts Pertaining To Ms. Cullinane's Uber Transaction**

36.     On June 29, 2014, Ms. Cullinane used the Uber app to obtain transportation from Logan Airport.

37.     Ms. Cullinane paid $23.91 for the trip from the airport.

38.    Uber charged her for the $5.25 toll *plus* the $8.75 "Logan Massport Surcharge and Toll," as itemized on the electronic invoice it sent to her via the app:



**Class Allegations**

39.    Uber's Boston website, https://www.uber.com/cities/boston, in a section entitled "The Fine Print," describes the $8.75 "Massport surcharge": "[t]rips to or from Logan International Airport on UberX, UberBLACK, or UberSUV are subject to a [sic] $8.75 surcharge and any applicable tolls. Surcharge *covers Massport fees* and *other costs related to airport trips*." (emphasis added).

40.     The Rider Support section of Uber's website explains further that: "[i]n select cities, there may be a nominal fee to compensate drivers for any airport fees they are charged as part of your trip."

https://support.uber.com/hc/en-us/articles/201836666-What-is-this-charge-for-a-toll-

41.     UberX vehicles which are not licensed livery services are not allowed to pick up passengers at Logan, nor are they charged a Massport fee of any sort for dropping passengers off at Logan.

42.     Those Uber vehicles which are licensed livery services or taxi services are only charged a $3.25 livery or $2.25 taxi fee if picking up at Logan, and no fees are assessed for drop-offs.

43.     There are no "other costs related to airport trips" that Uber incurs on trips to or from Logan.

44.     Uber has imposed the fictitious "Massport surcharge" upon tens of thousands of Logan-bound and outbound passengers, and continues to do so.

45.     The class is composed of all Massachusetts residents who, since October 18, 2011:

(a)     paid an Uber invoice including an $8.75 charge designated as "Logan Massport Surcharge and Toll"; and

(b)     have not received a refund of this charge for all amounts greater than the actual toll and any pickup fee paid by the Uber driver.

46.     Based on Uber's Logan Airport ride volume, the prospective class numbers in the tens of thousands, making joinder of all members impracticable.

The exact size of the proposed class and the identity of the class members are readily ascertainable from Uber's business records.

47.     There are questions of law and fact common to the class, which predominate over any questions affecting only individual class members. The principal common issues with respect to the class include: whether Uber's "Logan Massport Surcharge" breaches its contract with class members; whether the surcharge violates the UCC requirement of good faith and fair dealing; and whether Uber's retention of amounts in excess of the actual tolls and any livery or taxi fee paid constitutes unjust enrichment.

48.     There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions, other than those which can be determined by ministerial inspection of Uber's records, and the issues of liability are determinable entirely from the face of the operative documents.

49.     Ms. Nunez and Ms. Cullinane's class claims are typical of those of the class they seek to represent, and they will fairly and adequately protect and represent the interests of the class. There is no conflict between the claims of Ms. Nunez and Ms. Cullinane as class representative and the claims of the proposed class.

50.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of

litigation, it would be impractical and economically unfeasible for class members to seek redress individually. In addition, it is likely that most class members are unaware that they have claims. Finally, the prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against Uber.

51.     Ms. Nunez and Ms. Cullinane are represented by counsel competent and experienced in both consumer protection and class action litigation.

## Causes Of Action

## Count I

### (Breach of Contract: Covenant Of Good Faith and Fair Dealing)

52.     Uber's imposition of fictitious and inflated charges violates the covenant of good faith and fair dealing contained in its contracts. Such a requirement is also codified in UCC §§ 1-203 and 1-304.

53.     Uber's failure to act in good faith and deal fairly with class members is part of a pattern, or consistent with a practice, of noncompliance with its contractual obligations.

## Count II

### (Breach of Express Warranty)

54.     Uber's express representations that it is committed to ensuring the safest possible platform for Uber riders and drivers, performs an industry-leading background check process, conducts regular motor vehicle checks,

provides driver safety education, and provides complete pricing transparency

create warranties which go to the basis of the bargain made with Uber

passengers.

55.    Uber's disclaimer of the warranty obligations it created by its

express representations breaches those warranties and makes them illusory.

## Count III

### (Prohibited Warranty Disclaimer, UCC § 2-316A)

56.    Uber's express representations that it is committed to ensuring the

safest possible platform for Uber riders and drivers, performs an industry-

leading background check process, conducts regular motor vehicle checks,

provides driver safety education, and provides complete pricing transparency

create warranties which go to the basis of the bargain made with Uber

passengers.

57.    Uber's disclaimer of the warranty obligations it created by its

express representations violates the prohibition on such disclaimers contained in

UCC § 2-316A.

## Count IV

### (Unreasonable Negation of Warranties, UCC § 2-316)

58.    Uber's express representations regarding safety measures and

pricing transparency are directly contradicted and ostensibly negated by its

disclaimer of the warranties it created by those representations.

59.    Uber's unreasonable negation of those warranties by its various

disclaimers is inoperative, pursuant to the dictates of UCC § 2-316(1).

Count V

(Unjust Enrichment)

60.     By paying fictitious or inflated "Massport Surcharges" Ms. Nunez, Ms. Cullinane and Class members unwittingly conferred economic benefits upon Uber.

61.     Uber demanded and accepted these benefits, knowing that they were undeserved.

62.     Uber's collection, acceptance and retention of fictitious or inflated "Massport Surcharges," knowing that it was not entitled to them, is unjust and inequitable.

63.     In equity and good conscience Uber should not be permitted to retain these illegally obtained benefits.

Prayer For Relief

WHEREFORE, Ms. Nunez and Ms. Cullinane respectfully pray for:

A.     an order certifying these claims as a class action;

B.     a declaration that Uber's conduct breaches its contracts with class members, breaches its express warranties, and violates the UCC, as alleged in Counts I- IV, constitutes unjust enrichment as alleged in Count V, and that class members are entitled to a refund of all fictitious and inflated charges imposed, with interest thereon, and to such additional remedies as the UCC and common law provide;

C.      an order preliminarily and permanently enjoining Uber from

engaging in the practices challenged in this Complaint;

D.      pre-judgment interest to the extent permitted by law;

E.      such other and further relief as the Court may deem just and

proper.

### Demand For Jury Trial

Ms. Nunez and Ms. Cullinane demand a trial by jury of all issues so triable.

Respectfully submitted,

November 6, 2014

John Roddy, BBO # 242420
Elizabeth Ryan, BBO # 549632
Bailey & Glasser LLP
125 Summer Street, Suite 1030
Boston, MA 02110
(617) 439-6730
(617) 951-3954 (fax)

Pedro Jaile, BBO # 631410
Jaile & Trifilo LLC
188 Sumner Street
East Boston, MA 02128
(617) 561-3777
(617) 561-0300 (fax)