## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **RACHEL CULLINANE** | ) | |
| **JACQUELINE NUNEZ**, | ) | |
| **ELIZABETH SCHAUL**, and | ) | |
| **ROSS McDONAGH**, *on behalf* | ) | |
| *of themselves and others similarly situated,* | ) | **Case No.** 1:14-cv-14750 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | **Plaintiff's Opposition To Uber's Motion** |
| | ) | **To Compel Arbitration,** |
| **UBER TECHNOLOGIES, INC**., | ) | **Or In The Alternative, To Dismiss** |
| | ) | |
| Defendant. | ) | |
| | ) | |
_____)

TABLE OF CONTENTS

Introduction ................................................................................................................ 1

I.      Because Uber's Screen Design Neither Called Its Arbitration Clause To Plaintiffs'
        Attention Nor Required Their Unambiguous Manifestation Of Assent, No
        Agreement To Arbitrate Was Formed ............................................................... 3

II.     Uber's Browsewrap Agreement Is A Form Of Internet Adhesion Contract The
        Courts Have Almost Uniformly Refused To Enforce.......................................... 5

        A.      Browsewraps Lack Indicia of Disclosure and Consent ......................... 5

        B.      Courts Generally Have Enforced Browsewrap Terms Only Against
                Commercial Entities, Not Against Individuals ...................................... 6

        C.      As A Clickwrap Requires The Unambiguous Manifestation Of Assent
                Courts Have Almost Uniformly Enforced This Form ........................... 7

III.    Uber's BrowseWrap Meets None Of *Berkson's* Four Conditions For Enforcement.......... 8

        A.      Uber's Browsewrap Did Not Make The Plaintiffs Aware That They Were
                Ostensibly Binding Themselves To Arbitration ..................................... 9

        B.      Uber's Clear And Conspicuous Surge Pricing Disclosure And Assent
                Process Meets All The *Berkson* Criteria – And Contrasts Markedly With
                Its Opaque Arbitration Disclosure ....................................................... 11

        C.      The Final *Berkson* Factor Highlights How Uber's "Disclosure" Of Its
                Contract Terms Is Obscured, The Exact Opposite Of The Conspicuous
                Disclosure Both *Berkson* And Chapter 93A Require ........................... 12

IV.     Uber Similarly Cannot Show That Plaintiffs Unambiguously Manifested Assent
        To Its Browsewrap Arbitration Clause ............................................................. 14

        A.      The Leading Cases Have Rejected Browsewrap Agreements Just Like
                Uber's.................................................................................................... 14

        B.      Uber's Reliance on *Fteja* And Other Inapposite Cases Is To No Avail ............... 18

Conclusion ................................................................................................................ 20

i

TABLE OF AUTHORITIES

**Cases**

*Ajemian v. Yahoo!, Inc.*,
   83 Mass. App. Ct. 565, 987 N.E.2d 604 (2013) ............................................................. passim

*Berkson v. Gogo LLC*,
   No. 14-CV-1199, 2015 WL 1600755 (E.D.N.Y. Apr. 9, 2015) .................................... passim

*Calimlim v. Foreign Car Ctr., Inc.*,
   392 Mass. 228, 467 N.E.2d 443 (1984) ................................................................................ 13

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) ............................................................................... 7, 18

*Granite Rock Co. v. Teamsters*,
   561 U.S. 287 (2010) ................................................................................................................. 3

*Hines v. Overstock*,
   380 Fed. App'x. 22 (2d. Cir. 2010) ...................................................................................... 15

*In re Zappos.com, Inc., Customer Data Sec. Breach Litigation*,
   893 F.Supp.2d 1058 (D. Nev. 2012) ..................................................................................... 16

*IT Strategies Group, Inc. v. Allday Consulting Group, LLC*,
   975 F. Supp. 2d 1267 (S.D. Fla. 2013) ................................................................................. 18

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ......................................................................................... passim

*Pollstar v. Gigmania, Ltd.*,
   170 F. Supp. 2d 974 (E.D. Cal. 2000) ................................................................................... 10

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) ................................................................................................. 15

*Specht v. Netscape Communic'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002) ..................................................................................... 1, 2, 14, 15

*Tompkins v. 23andMe, Inc.*,
   No. 5:13-CV-05682-LHK, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ...................... 8, 16

*United States v. Drew*,
   259 F.R.D. 449 (C.D. Cal. 2009) ............................................................................................ 6

**Other Authorities**

Allison S. Brehm and Cathy D. Lee, "*Click Here to Accept the Terms of Service*," 31–
   WTR Comm. Law. 4 (2015) .................................................................................................. 12

Consumer Financial Protection Bureau, Arbitration Study Report to Congress, pursuant
   to Dodd–Frank Wall Street Reform and Consumer Protection Act § 1028(a) (March
   2015) ...................................................................................................................................... 18

ii

Florencia Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's Principles of the Law of Software Contracts*" 78 U. Chi. L. Rev. 165, 178 (2011) ................................................................................................ 15

**Regulations**

940 C.M.R. 6.01(c) ...................................................................................................... 3

**INTRODUCTION**

Uber has imposed nonexistent "Massport surcharges" of $8.75 per person on approximately one million Massachusetts consumers to date, and continues to do so. It now seeks to derail this class action and avoid accountability by claiming that Plaintiffs agreed to the arbitration clause contained in Uber's online "browsewrap" contract. But a contract – even a digital one – cannot be formed unless its material terms are clearly and conspicuously disclosed and assent is unambiguously manifested. *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 576, 987 N.E.2d 604, 613 (2013) (failure to conspicuously disclose forum selection clause, a material contract term, precluded its enforcement). Neither occurred in this case. For online transactions, like Uber's, there are two basic means of forming a contract. A *clickwrap* agreement, which anyone who has made a purchase online is familiar with, requires the user to assent to terms by clicking a box labeled "I agree." A *browsewrap* agreement purports to obtain the user's assent without any express agreement. *Hines v. Overstock.com*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009), *aff'd*, 380 Fed. Appx. 22 (2d. Cir. 2010); *see also Specht v. Netscape Comm Corp.,* 306 F.3d 17, 30-34 (2d Cir. 2002). This case involves Uber's use of a browsewrap.

Courts have traditionally been reluctant to recognize contracts ostensibly formed without affirmative consent, like the browsewrap form chosen by Uber. The leading case on "browsewrap," *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178 (9th Cir. 2014), explains the source of this reluctance:

> [W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—*without more*—is insufficient to give rise to constructive notice.

*Id*. At 1178-79.

Whether browsewrap, clickwrap or some variation on those two themes, the offeror must prove two things: reasonably conspicuous notice of the material contract terms and unambiguous manifestation of assent to those terms. *Specht,* 306 F.3d at 35; *see also Be In, Inc. v. Google Inc.,* No. 12-cv-03373, 2013 WL 5568706, at *6–8 (N.D. Cal. Oct. 9, 2013) (collecting cases); *Nguyen*, 763 F.3d at 1173; *Berkson v. Gogo LLC,* --- F. Supp. 3d ---, No. 14-CV-1199, 2015 WL 1600755, at **25-26 (E.D.N.Y. Apr. 9, 2015).

Uber knows how to clearly communicate with its customers to obtain their unambiguous assent. It "take[s]  . . . seriously" its obligation to "notify[]" customers of certain features of its program. *See What is Surge Pricing,* (June 5, 2015) *available at* http://ubr.to/1dQX309. For "surge" price increases, for example, Uber delivers a "notification screen" to every user's phone that requires affirmative "accept[ance]"—through the actual checking of a box—before a customer can connect to a driver. *Id.* For its arbitration agreement, however, Uber has decided to forego this practice. Instead of conspicuously "notifying" its users of the arbitration agreement and requiring affirmative acceptance, Uber has opted to bury the agreement behind a difficult-to-see link to a generic "Terms and Conditions" page that no user is required to click on when registering an account. The result is unsurprising: users do not know they have purportedly agreed to arbitrate their disputes, and they have not clearly assented to Uber's arbitration agreement.

Two aspects of Uber's browsewrap render it unenforceable under all relevant case law. Uber's notice that "by creating an Uber account you are agreeing to" the hyperlinked "terms and conditions" is distinctly less noticeable than anything else on the registration screen; it is written in greyed out type on a blue background, the antithesis of the required conspicuous disclosure. And Uber's contract terms are not displayed on the registration screen, but can only be accessed

2

by clicking on a hyperlink that takes the user to a separate web page,[1] a "click" that is not required to complete the registration process, and as such does not require the unambiguous assent to its terms the law requires.

As the party seeking to enforce the arbitration provision, Uber bears the burden of establishing clear disclosure to and assent by the Plaintiffs to that term. Its motion, which focuses almost entirely on the content of its agreement rather than the way in which it was allegedly formed, fails to do so. For the same reasons *Specht, Nguyen, Ajemian*, and other courts have rejected inconspicuous, unassented to browsewrap agreements, this Court should reject Uber's.

## I.     BECAUSE UBER'S SCREEN DESIGN NEITHER CALLED ITS ARBITRATION CLAUSE TO PLAINTIFFS' ATTENTION NOR REQUIRED THEIR UNAMBIGUOUS MANIFESTATION OF ASSENT, NO AGREEMENT TO ARBITRATE WAS FORMED

Assent, whether by writing or conduct, is "the touchstone of contract." *Nguyen,* 763 F.3d at 1175 (internal citations omitted). And courts — not arbitrators — "must resolve" questions of contract formation and "arbitrability"; that is, whether parties are bound by a given arbitration clause. *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299–300 (2010). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Berkson*, 2015 WL 1600755, at *13-14. So the contract formation inquiry does not begin, as Uber assumes, with the content of the provisions themselves, but with the method through which an electronic contract was—or, as here—was not formed.

An agreement between consumers and Uber to pay for the ride summoned via Uber's app is within the reasonable expectations of the parties. An arbitration clause is not subject to reasonable consumer expectations, and as a material contract term, is subject to contract

---

[1] The Attorney General's Retail Advertising Regulations state that material terms which "require reference to an outside source, such as 'see web site for details'" are not clear and conspicuous. 940 C.M.R. 6.01(c).

3

formation analysis. "Unlike the basic internet contract for a sale and payment, arbitration and forum selection clauses materially alter the substantive default rights of a consumer; they are not enforceable against ordinary consumers who are unlikely to be aware of them."*Berkson*, 2015 WL 1600755, at *2. Like any other material contract term, an arbitration agreement must be conspicuously disclosed and requires the express, unambiguous assent of the parties to be binding. *Ajemian*, 987 N.E.2d at 612; *Nguyen*, 763 F.3d at 1173.

Uber mischaracterizes Plaintiffs' position, erroneously suggesting they are trying to avoid the terms of their agreement on the grounds that they "chose not to read it." Uber Brief at 7. While it is true that with an internet contract, like any contract, a party cannot avoid its terms "on the ground that he or she failed to read it before signing," *Hirsch v. Citibank, N.A.,* 542 Fed.Appx. 35, 37 (2d Cir. 2013), that is not the issue here. A party is not bound "when the writing does not appear to be a contract and the terms are not called to the attention of the recipient." *Id*., (quoting *Specht,* 306 F.3d at 30). And when it comes to internet adhesion contracts in particular, the burden is on the offeror to make its customers aware of what terms they are agreeing to, because "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Nguyen,* 763 F.3d at 1178-79.

Uber's motion to dismiss avoids two critical questions. First, were Uber's terms and conditions, containing its arbitration clause, conspicuously called to Plaintiffs' attention? If not, Plaintiffs cannot be compelled to arbitrate. Second, even if the Plaintiffs were on "inquiry notice" of the terms and conditions, did they unambiguously manifest assent to those terms and conditions? If not, they are similarly not bound to arbitrate. Neither question can be affirmatively answered.

II.     UBER'S BROWSEWRAP AGREEMENT IS A FORM OF INTERNET ADHESION CONTRACT THE COURTS HAVE ALMOST UNIFORMLY REFUSED TO ENFORCE

The graphics in Uber's brief show its terms and conditions hyperlink appearing on the bottom of the "Link Payment" page. Uber Brief, at 3, 5. On the link payment screen, the top right corner of the screen has a button marked "Done." Clicking on the "Done" button takes the user to the next screen, which allows the user to summon a ride. But "Done" does not signify anything other than that the information entry process is complete. That button does not say "I accept" or anything similar, so the message it gives is not that the consumer is agreeing to Uber's terms, but rather that he or she is finished with information entry.

On that score, Uber's brief expressly mischaracterizes the registration process. It claims: "Directly above the sign-up button that completes the registration process is a textual notice stating: 'By clicking 'Submit' below, you are agreeing to the Uber terms and conditions and privacy policy.'" Uber Brief, at 16. But there is no "Submit" button, nor is there any text referencing such a button as Uber's own exhibit confirms. *See* Paul Holden Declaration, ¶ 15, and Exhibits D-1 to D-4 (Dkt. Nos. 32-1, 32-5). The only button that Plaintiffs or any other user clicked to complete the registration process is the "Done" button described above. And although Holden's Declaration enlarges the screen exponentially, Uber's brief shows it at actual size, underscoring how unreadable the greyed out "notice" text is.  "Scan your card" and "enter promo code" are very readable, the "notice" is not.

This is a browsewrap form, not a clickwrap, nor a "hybrid" of any sort.

A.     BROWSEWRAPS LACK INDICIA OF DISCLOSURE AND CONSENT

Browsewraps come in varying forms "but basically the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service." *United*

*States v. Drew,* 259 F.R.D. 449, 462 n. 22 (C.D. Cal. 2009). Because browsewraps imply assent

rather than require it, courts have almost uniformly refused to enforce them. For example, in

*Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 576, 987 N.E.2d 604, 613 (2013), the Appeals

Court held that Yahoo's browsewrap did not bind users to its forum selection clause, because

such online contracts have been enforced "*only* where the record established that the terms of the

agreement were displayed, at least in part, on the user's computer screen and the user was

required to signify his or her assent by 'clicking' 'I accept.'" (court's emphasis).[2]

The Appeals Court surveyed the landscape but could not find a single case that enforced

an undisclosed material term, like the forum selection clause in *Ajemian* or the arbitration clause

here, when contained in a browsewrap. *Id*. Because it found that Yahoo failed to show that its

terms of service "were displayed (in whole or part)" to the plaintiffs, or that it required assent

"by clicking 'I accept' or by taking some similar action" … *the record does not reflect that the*

*terms of any agreement were reasonably communicated or that they were accepted." Id.*

(emphasis added). *See also,* Allison S. Brehm and Cathy D. Lee, *"Click Here To Accept The*

*Terms of Service*, 31 Comm. Lawyer 4, 4 (Winter 2015) ("courts have declined to enforce

browsewrap agreements because the fundamental element of assent is lacking").

### B.   COURTS GENERALLY HAVE ENFORCED BROWSEWRAP TERMS ONLY AGAINST COMMERCIAL ENTITIES, NOT AGAINST INDIVIDUALS

That Plaintiffs are individual consumers, and not sophisticated or knowledgeable

business entities, adds further weight to the case against enforcing Uber's forced arbitration

clause. Judge Weinstein observed in *Berkson* that, "[f]ollowing the ruling in *Specht,* courts

generally have enforced browsewrap terms only against knowledgeable accessors, such as

---

[2] *Ajemian* cites *Hughes v. McMenamon,* 204 F.Supp.2d 178, 181 (D. Mass. 2002), for reference to its collection of cases regarding online contracts, but apart from *Ajemian* and *McMenamon's* somewhat dated compendium, First Circuit jurisprudence on the issue is sparse.

corporations, not against individuals." *Berkson,* 2015 WL 1600755 at *27, citing *Register.com, Inc. v. Verio,* 356 F.3d 393, 403 (2d Cir. 2004); *Ticketmaster Corp. v. Tickets.com, Inc.,* No. 99–CV–7654, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003); Mark A. Lemley, *Terms of Use,* 91 Minn. L.Rev. 459, 472 (2006) ("An examination of the cases that have considered browsewraps in the last five years demonstrates that the courts have been willing to enforce terms of use against corporations, but *have not been willing to do so against individuals.*") (emphasis added by court).

This consideration has been recognized by other courts and commentators as well. *See Nguyen,* 763 F.3d at 1178 (noting "courts' traditional reluctance to enforce browsewrap agreements against individual consumers") citing Woodrow Hartzog, *Website Design as Contract,* 60 Am. U.L.Rev. 1635, 1644 (2011) (observing that courts "tend to shy away from enforcing browsewrap agreements that require no outward manifestation of assent"); also citing *Lemley,* supra. Even *Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829, 836 (S.D.N.Y. 2012), which *Berkson* and *Ajemian* roundly criticize, notes that  "the cases in which courts have enforced browsewrap agreements have involved users who are businesses rather than, as in *Specht* and in this case, consumers").

### C.    AS A CLICKWRAP REQUIRES THE UNAMBIGUOUS MANIFESTATION OF ASSENT COURTS HAVE ALMOST UNIFORMLY ENFORCED THIS FORM

Clickwrap agreements require an affirmative act of assent by the website user, and so courts generally find them enforceable. As a "clickwrap agreement typically requires users to click [an] I agree' box after being presented with terms of agreement" courts have "almost uniformly [] enforced … clickwrap agreements." *Ajemian*, 83 Mass. App. Ct. at 576 (contrasting the unenforceability of browsewrap contract terms with comparable clickwrap terms); *see also Nguyen*, 763 F.3d 1171, 1176 (9th Cir. 2014) (courts have been more willing to find requisite

7

notice of terms with a clickwrap type agreement in which user is required to acknowledge the agreement before proceeding with the use of the website).

Such an unambiguous manifestion of assent is shown in the graphic below, taken from *Tompkins v. 23andMe, Inc*., No. 5:13-CV-05682-LHK, 2014 WL 2903752, at *6 (N.D. Cal. June 25, 2014), showing the account creation page, which requires customers to check a box next to the line, "Yes, I have read and agree to the Terms of Service and Privacy Statement."



### III.    UBER'S BROWSEWRAP MEETS NONE OF *BERKSON'S* FOUR CONDITIONS FOR ENFORCEMENT

In *Berkson v. Gogo LLC*, Judge Weinstein of the Eastern District of New York exhaustively reviews the applicable jurisprudence on internet adhesion contracts and proposes a framework for adapting established contract formation doctrine to the unique nature of internet agreements. He asks four questions:

(1) Is there substantial evidence from the website that the user was aware that she was binding herself *to more than an offer of services or goods in exchange for money*?

(2) Did the design and content of the website, including the homepage, make the "terms of use" (*i.e.,* the contract details) readily and obviously available to the user?

(3) Did the merchant *clearly draw the consumer's attention to material terms* that would alter what a reasonable consumer would understand to be her default rights …[including] the right to …  bring a civil consumer protection action … and participate in a class or collective action?

If the answer to any of the above is "no," then the "terms of use," including any arbitration clause, should not be enforced against the purchaser. *Berkson*, 2015 WL 1600755 at

*32-33 (emphasis added). And lastly:

> (4) Was the importance of the details of the contract obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product?

If so, then the arbitration term should not be enforced against the purchaser. *Id. Uber*, not Plaintiffs, bears the burden of showing the Plaintiffs' agreement to that material term – a burden it has not carried. It must show that a reasonable person in the Plaintiffs' position would have known what they were assenting to. *Id*. at *34.

### A.      UBER'S BROWSEWRAP DID NOT MAKE THE PLAINTIFFS AWARE THAT THEY WERE OSTENSIBLY BINDING THEMSELVES TO ARBITRATION

It is important to note that *Berkson* analyzed disclosure and assent in the context of a website, which the user is viewing on a computer monitor. Uber's app is designed to be used on a smartphone, with a correspondingly smaller viewing area. The Plaintiffs' iPhones have screens that are only 4 inches wide. To bring attention to material terms on a screen that small requires much better "notice" than Uber provided at registration—it requires the kind of design Uber used for its surge pricing agreement.

*Berkson's* first inquiry is whether "there [is] substantial evidence from the website that the user was aware that she was binding herself *to more than an offer of services or goods in exchange for money*?" *Id*. at *33. Uber's browsewrap registration process utterly failed to make Plaintiffs aware that they were not just agreeing to an offer of a ride connection in exchange for money, but also purportedly waiving their right to sue or be part of a class action like this one. Uber has not put forth any evidence, let alone *substantial* evidence, that Plaintiffs ever knew an arbitration clause existed, much less that they were binding themselves to it.  In a clickwrap – the form of agreement Uber uses to impose its "surge pricing" terms on users - the Court may infer such awareness because the user must affirmatively click an "I agree" box or similarly

unambiguous manifestation of assent before proceeding with the transaction.  Here, Uber only put a hyperlink underneath virtually unreadable, faint text that did not compel a reasonable user to review the terms of the "agreement."

Next, *Berkson* asks if the design and content of the website, including the homepage, make the 'terms of use' (*i.e.,* the contract details) readily and obviously available to the user. Uber's design and the content of the registration process did not make the contract details readily and obviously available to the Plaintiffs. Uber's registration process concludes with the user entering payment information and clicking a button labeled "Done." Uber claims that clicking the "Done" button somehow conveys unambiguous manifestation of assent to the terms contained in a hyperlink. No reasonable consumer would so understand it. "Done" means finished in ordinary parlance, not "I accept."

*Berkson's* third query is whether "the merchant *clearly draw[s] the consumer's attention to material terms* that would alter what a reasonable consumer would understand to be her default rights …[including] the right to …  bring a civil consumer protection action … and participate in a class or collective action?"

Uber could have clearly drawn its customers' attention to the arbitration provisions, but chose a screen design that appeared more intended to avoid attention than to draw it. Uber uses text on its registration screen — a greyed out "notice" on a dark blue background—that is very difficult to notice. Trying to read that text, contained in the graphic on page five of Uber's brief, illustrates just how obscured its message is. This is the antithesis of clear and conspicuous notice. *See Pollstar v. Gigmania, Ltd.,* 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background).

**B.    UBER'S CLEAR AND CONSPICUOUS SURGE PRICING DISCLOSURE AND ASSENT PROCESS MEETS ALL THE *BERKSON* CRITERIA – AND CONTRASTS MARKEDLY WITH ITS OPAQUE ARBITRATION DISCLOSURE**

Uber knows how to conspicuously disclose terms when it wants to. In contrast to the obscure "terms & conditions" disclosure, which does not require the customer's affirmative assent to those terms, Uber ensures that the customer knows of surge pricing before imposing any charges, and requires the customer's affirmative "clickwrap" assent to the declaration, "I ACCEPT HIGHER FARE" before summoning a vehicle.  Uber discloses the amount of the surge pricing surcharge, and requires the customer to affirmatively agree to that surcharge before it acknowledges that an agreement on those terms has been reached. Uber's stated purpose for this multi-step process is that it wants to ensure that these contract terms are "clear and straightforward." *http://blog.uber.com/2012/12/28/surge2012/*

Uber illustrates this three step process on its website.

  

By using this "clear and straightforward" disclosure process, coupled with requiring the customer's affirmative election to accept the disclosed terms, Uber hopes to ensure that, at least with respect to its surge pricing, its customers "won't be surprised" by the terms of its contract. http://blog.uber.com/2012/12/28/new-years-eve-2012/#QA.

Uber's explanation implicitly suggests that less prominent notice, like the arbitration clause, *would* result in surprise. In contrast to the obscured notice of "terms and conditions" which contain the unexpected arbitration provision, this surge pricing disclosure is in accord with best practices suggested by web designers and with cases that have enforced such contracts. *Berkson* notes that such experts recommend designing a website that requires the user to scroll through the "terms of use" *and* click "accept" as one such good practice—one which ensures consumers won't be unfairly surprised. *Berkson,* 2015 WL 1600755, at *17. *See, e.g.,* Allison S. Brehm and Cathy D. Lee, "*Click Here to Accept the Terms of Service,*" 31–WTR Comm. Law. 4, 6–7 (2015).

The discrepancy between Uber's conspicuously disclosed surge pricing, coupled with its unambiguously manifested "clickwrap" assent requirement, contrasts starkly with the undisclosed arbitration language and provides further support for finding that Uber's customers were indeed unfairly "surprised" to learn that it would seek to compel arbitration of their claims.

### C.   THE FINAL *BERKSON* FACTOR HIGHLIGHTS HOW UBER'S "DISCLOSURE" OF ITS CONTRACT TERMS IS OBSCURED, THE EXACT OPPOSITE OF THE CONSPICUOUS DISCLOSURE BOTH *BERKSON* AND CHAPTER 93A REQUIRE

Even if the Court were to find that Uber's arbitration agreement met the first three *Berkson*, factors, which it does not, Uber would still need to satisfy the fourth: "Was the importance of the details of the contract obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product?"

As noted in section A, above, Uber's design deliberately minimized and made more difficult to read than surrounding text the greyed out "notice" that creation of an Uber account would subject the user to its terms and conditions. This minimized disclosure meets neither the *Berkson* criterion nor the longstanding Chapter 93A requirement that material terms be clearly and conspicuously disclosed. *See, e.g., Calimlim v. Foreign Car Ctr., Inc*., 392 Mass. 228, 230,

467 N.E.2d 443, 445 (1984) n. 2. ("Clear and conspicuous disclosure" is defined as that "of such

size or color contrast and so placed as to be readily noticeable to purchasers or prospective

purchasers .... A term is conspicuous when it is so written that a person against whom it is to

operate ought to have noticed it.") There is no mention of arbitration anywhere on the

registration screen and the only reference to its "terms and conditions" seems designed to

obscure rather than draw attention to the hyperlink which "discloses" those terms.

Like *Berkson*, the Attorney General's regulations offer questions relevant to determine

whether clear and conspicuous disclosure has been made. The regulations provide the following

additional considerations relevant here, particularly, as noted, given that the transactional

information is contained on a four inch phone screen:

- are material terms *disclosed in the advertisement itself, but require reference to an outside source, including but not limited to* those offers that specify: see store for details, *see web site for details*

- does the font's size and appearance make it noticeable and legible;

- is text of the disclosure is printed against a contrasting background;

940 C.M.R. 6.01 (emphasis added).

Uber's disclosures not only fail all four of the *Berkson* conditions, they fail Chapter

93A's requisites as well. All the applicable principles of Massachusetts law correspond directly

with the *Berkson* factors. Because its disclosures fall far short of clear and conspicuous under

any measure, Uber's arbitration clause should not be enforced. *Berkson*, 2015 WL 1600755, at

*32-33.[3]

---

[3] Uber's contractual estoppel argument, i.e. that Plaintiffs cannot sue under a contract while simultaneously contending they did not assent to terms in that contract, Uber Brief at 1, can be disregarded in light of Plaintiffs' pending Motion for Leave to File Second Amended Complaint (ECF No. 36). Plaintiffs' proposed Second Amended Complaint contains no breach of contract claims, thus mooting Uber's argument. And, as a matter of law, courts reject this notion outside

**IV.     UBER SIMILARLY CANNOT SHOW THAT PLAINTIFFS UNAMBIGUOUSLY MANIFESTED ASSENT TO ITS BROWSEWRAP ARBITRATION CLAUSE**

Because Uber cannot show that its arbitration provision was clearly and conspicuously disclosed, there cannot be unambiguous assent to it. In addition, because it designed its registration process so that its customers were not required to unambiguously manifest their assent to its terms, unlike its clickwrap "surge pricing" terms, Uber cannot establish consent. *See 23andMe*, 2014 WL 2903752, at *6 (defendant's website [like Uber's] did not require customers to acknowledge the terms of service during purchase, so no assent was established); *Specht*, 306 F.3d at 28–30 (noting that clickwrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website").

**A.     THE LEADING CASES HAVE REJECTED BROWSEWRAP AGREEMENTS JUST LIKE UBER'S**

Writing for the unanimous panel in *Specht*, the seminal browsewrap case, then-Judge Sotomayor ruled that browsewrap agreements accessible by hyperlinks often fail to form a valid contract to arbitrate. *Specht*, 306 F.3d at 31 ("We are not persuaded that a reasonably prudent offeree in these circumstances would have known of the existence of license terms. Plaintiffs were responding to an offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms.")

Judge Sotomayor explains that for an Internet browsewrap contract to be binding, consumers *must* have reasonable notice of a company's "terms of use" and exhibit *unambiguous*

---

of the third-party, non-signatory context. In *Nguyen*, Barnes & Noble argued that, by ratifying a choice-of-law provision in the Terms of Use, Nguyen could not avoid the arbitration agreement also contained in the Terms of Use. But the court explained that equitable estoppel is "typically applie[d] to third parties who benefit from an agreement made between two primary parties. 763 F.3d at 1179. A consumer obtaining services directly from a company "is not the type of non-signatory contemplated by the rule, …whether he is a primary party to the Terms of Use lies at the heart of" the dispute. 763 F.3d. at 1180.

*assent* to those terms. *Specht,* 306 F.3d at 35; *see also Be In,* 2013 WL 5568706, at *6–8 (collecting cases); *Berkson*, 2015 WL 1600755, at *25-26 (consumer did not agree to wireless internet service provider's terms of use where consumer never had hard copy of terms, provider's notice of terms was inadequate, and consumer was never required to click an "I accept" or "I agree" button.)

As in *Specht,* here Plaintiffs are "reasonably prudent offeree[s]" who were not placed on notice by the browsewrap notice and as a result are "not bound by the arbitration clause contained in those terms." *Id*. at 35. That reasonably prudent offerees are not put on notice by a browsewrap is borne out by the data. A recent study concluded that consumers clicked browsewrap hyperlinks only 0.03% of the time. Florencia Marotta-Wurgler, *Will Increased Disclosure Help? Evaluating the Recommendations of the ALI's Principles of the Law of Software Contracts*" 78 U. Chi. L. Rev. 165, 178 (2011) ("There were 120,545 visits to companies that use browsewraps, ... The total number of EULA [End User License Agreements] visits for these companies was 40 out of 120,545, or 0.03 percent of all visits.").

Similarly, in *Hines*, the court denied the enforceability of a browsewrap agreement where the terms were accessible only by a hyperlink to a separate document on a submerged website page. *Hines v. Overstock*, 380 Fed. App'x. 22, 24-25 (2d. Cir. 2010). *Hines* rejected Overstock.com's claim that "users of the Overstock Website 'accept' the Terms and Conditions merely by using the website," finding that such a claim "does not support a finding that a binding agreement existed." *Hines*, 380 Fed. Appx. at 25.

While not exclusively involving browsewrap, the Second Circuit more recently refused to require arbitration where consumers were not required to click their assent to an Internet agreement they never reviewed in *Schnabel v. Trilegiant Corp.*, 697 F.3d 110 (2d Cir. 2012).

15

There—as here—the arbitration provision was not provided on a website page reviewed by the plaintiffs. *Id*. at 121. Similar to the browsewrap context, the defendant there relied on the plaintiffs' passive consent after being provided with an opportunity to review the agreement accessible by hyperlink. *Id*. at 113, 116. Citing *Specht*, the court held that a reasonable consumer would not have been put on notice of the agreement. *Id*. at 123, 127. It separately found that assent to contract could not be implied from the consumers' "passive" act of merely paying for a product offered on the Internet subject to terms contained in a separate document. *Id*. at 128-29.

In *In Re Zappos.com., Inc*., the court considered whether to compel arbitration involving the browsewrap used by Amazon and its subsidiary, Zappos.com, Inc. Even though the hyperlink employed by the defendants' website was "found on every Zappos webpage" and was "the same size, font, and color" as its other hyperlinks, it did not create a valid agreement to arbitrate. 893 F. Supp. 2d at 1064. Applying *Specht* and *Hines*, the *Zappos* Court held that the notice used by Amazon and its subsidiaries was not sufficient to require arbitration:

> This case is therefore factually similar to cases that have declined to enforce arbitration clauses, such as *Hines v. Overstock.com*, wherein the Court refused to enforce an arbitration provision because the plaintiff "lacked notice of the Terms and Conditions because the website did not prompt her to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions."

*Id*. (modifications in original; internal citations to additional browsewrap decisions omitted). And most recently, in *23andMe*, 2014 WL 2903752, the court found that even something as clear as the following has been found insufficient to create inquiry notice.

16

The court noted that at the point of sale the terms of service disclosure "closely resembled a browsewrap agreement and provided insufficient notice to customers who bought DNA kits. There is no dispute that 23andMe's website [like Uber's] did not require customers to acknowledge the TOS during purchase." *Id.,* at *6.

Like *23andMe,* Uber cannot rely on unmanifested "acceptance" of its terms of service at registration to create either offer or acceptance of undisclosed material terms.  "As explained above, during checkout, the website *did not present* or *require* acceptance of the TOS. *Id.*, at *6 (emphasis added). Perhaps the reason that the courts have so vehemently rejected browsewraps is the reality that this particular form of internet adhesion contract violates the norm that disallows unexpected terms.

In demonstrating assent to the terms of an electronic contract of adhesion, the offeror must show that a reasonable person in the position of the consumer would have known what he was assenting to. Unlike the basic internet contract for a sale and payment, arbitration and forum selection clauses materially alter the substantive default rights of a consumer; they are not enforceable against ordinary consumers who are unlikely to be aware of them. *Berkson,* 2015 WL 1600755, at *2. An arbitration clause containing a class action waiver provision is clearly an

unexpected term to the vast majority of consumers, one which they neither expect nor understand. The Consumer Financial Protection Bureau, [4] recently surveyed more than 1,000 credit card holders and reviewed 850 consumer financial contracts – actual printed contracts that were provided to cardholders and which contained arbitration clauses. It found that most consumers are unaware of forced arbitration clauses, fewer than 7% of those consumers understood that they could not sue their credit card company, and most believe that they can participate in class actions despite the arbitration clause. CFPB Report, at 4, 11.

### B.   UBER'S RELIANCE ON *FTEJA* AND OTHER INAPPOSITE CASES IS TO NO AVAIL

Uber claims that Plaintiffs' clicking the "Done" button "was the electronic equivalent of affixing their signatures to the contract." Uber Brief, at 7. Uber misguidedly bases much of its analysis on the reasoning in *Fteja v. Facebook, Inc.,* 841 F. Supp. 2d 829 (S.D.N.Y. 2012). However, as Judge Weinstein observed in *Berkson,* "*Fteja,* and lower court cases that follow its lead, mischaracterize important Supreme Court and Court of Appeals precedent regarding contracts and the reasonable person standard that must be applied to inquiry notice of, and manifestation of assent to, the terms in a contract of adhesion." *Berkson,* 2015 WL 1600755, at *34. The proper standard is instead that the "offeror must show that a reasonable person in the position of the consumer would have known about what he was assenting to." *Id. See also Ajemian,* 987 N.E.2d at 613 (distinguishing *Fteja* as finding assent in a clickwrap agreement and noting court had "found no case where [a forum selection] clause has been enforced in a browsewrap agreement"); *IT Strategies Group, Inc. v. Allday Consulting Group, LLC,* 975 F. Supp. 2d 1267, 1282 (S.D. Fla. 2013) (*Fteja* "did not involve a true browsewrap").

---

[4] Consumer Financial Protection Bureau, Arbitration Study Report to Congress, pursuant to Dodd–Frank Wall Street Reform and Consumer Protection Act § 1028(a) (March 2015), http://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf.

18

Uber's cursory reliance on *Carnival Cruise* (like that of the *Fteja* court), Uber Brief at 15, n. 11, is similarly misplaced, as the terms of use here "aside from assuming the consumer's knowledge of the significance of a hyperlink, had none of the precautions taken by Carnival Cruise Lines Inc." *Berkson,* 2015 WL 1600755, at *34 (citing *Carnival Cruise,* 499 U.S. at 587). In marked contrast to the inconspicuous presentation here, "[t]he hardcopy ticket in *Carnival Cruise* announced its terms by (1) using the word 'contract' twice; (2) addressing the reader in all caps; (3) indicating where to find the contract; and (4) inserting the word 'important' and the phrase 'please read.'" *Id.* Accordingly, the *"contract scenario in Carnival Cruise should not be analogized to electronic websites' contracts of adhesion. It is inapposite.* Crucially, respondents in *Carnival Cruise* 'conceded that they were given notice of the forum provision.'" *Id.* (emphasis added). As in *Berkson,* this "is not true in the instant case." *Id.*

The other cases Uber relies upon are inapposite and factually distinct.  Most involve cases of affirmative assent through agreements, unlike Uber's, that require the user to click a button next to a warning that doing so constitutes acceptance of the terms and conditions. For example, in *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908, 911 (N.D. Cal. 2011), videogame users were required to click a button marked "Accept," below which appeared the notice that clicking "Accept" meant accepting the hyperlinked terms of service.  Uber's app has no such requirement.

*Nicosia v. Amazon.com, Inc.*, No. 14-CV4513, 2015 WL 500180, at *5 (E.D.N.Y. Feb. 4, 2015), appeal docketed, No. 15-423 (2d. Cir., Feb. 13, 2015) involved an online purchase on Amazon.com by a purchaser who had expressly agreed to Amazon's terms and conditions when he set up his Amazon account, as well as a hyperlink  with "terms of use" that appeared below the "place your order" button *and* the warning that by placing an order, the purchaser agrees to

Amazon's terms.  *Crawford v. Beachbody, LLC*, No. 14CV1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) involved a similar process, where a website user was required to click a button marked "Place Order" that appeared just below a statement that by clicking the button the user was subject to the website's "terms and conditions," which were available in the same screen via hyperlink. *Major v. McCallister,* 302 S.W.3d 227, 229 (Mo. Ct. App. 2009) also involved a submission button that appeared next to the link for terms and conditions, and warning that clicking the button was agreeing to terms of use.[5] Finally, *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 124 (Ill. App. Ct. 2005) involved application of a unique aspect of Texas law: "Texas law invalidates only certain types of clauses if they are inconspicuous … and an arbitration agreement is not one of those."

## CONCLUSION

Uber's "buyer beware" approach is at odds with the vast majority of cases evaluating browsewrap agreements and the enduring notion that a party is not bound by terms it was neither aware of nor expecting. Uber could have made the disclosures of its terms obvious and noticeable, and required unambiguous assent to such clearly disclosed terms – as it chose to do with surge pricing. Instead it designed its app so that key terms remained hidden behind links that customers were not required to access. Having chosen this design and process, it cannot meet its burden to show that Plaintiffs agreed to arbitrate their dispute. Uber's motion to compel arbitration should be denied in its entirety.

---

[5] Both *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12cv426, 2013 WL 5328324, *4 (E.D.N.Y. Sept. 23, 2013) and *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-04825, 2005 WL 756610, at *4-5 (N.D. Cal. Apr. 1, 2005), are commercial cases and so inapposite for that reason.

Dated: June 5, 2015

Respectfully submitted,

*/s/ John Roddy*
John Roddy, BBO # 424240
Elizabeth Ryan, BBO # 549632
Bailey & Glasser LLP
99 High Street, Suite 304
Boston, MA 02110
(617) 439-6730
(617) 951-3954 (fax)

Pedro Jaile, BBO # 631410
Jaile & Trifilo LLC
188 Sumner Street
East Boston, MA 02128
(617) 561-3777
(617) 561-0300 (fax)

21

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on June 5, 2015.

*/s/ John Roddy*
John Roddy

22