## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RACHEL CULLINANE<br>JACQUELINE NUNEZ,<br>ELIZABETH SCHAUL, and<br>ROSS McDONAGH, *on behalf*<br>*of themselves and others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.** 1:14-cv-14750<br><br><br>**Jury Trial Demanded**<br><br>Leave to file granted<br>June 22, 2015 |

### Second Amended Class Action Complaint

### Introduction

1.     Uber is a "ride sharing" service that transports customers throughout the Boston area for a fee. Uber passengers summon Uber vehicles using a cell phone app, and pay the fare through the same app.

2.     UberX, UberBLACK and UberSUV vehicles transporting passengers to and from Logan Airport charge a fare, and an additional $8.75 fee for a so-called "Logan Massport Surcharge and Toll" ("Massport Surcharge").

3.     For airport drop-offs, there is no such thing as a "Massport Surcharge." Neither Massport nor Logan impose a fee, charge or "surcharge" of any sort upon any Uber vehicles dropping passengers off at Logan Airport.

4.     And the "Massport Surcharge" is inflated for airport pick-ups.

Only Massport permitted transport providers can pick passengers up at Logan. Such licensed livery services, some of which are accessible using Uber, pay a $3.25 fee for Logan pick-ups – not $8.75 - but that is the only "Massport Surcharge" applicable to Uber vehicles picking up at Logan.

5.      Uber charges similar non-existent airport fees in other major metropolitan areas. Approximately three weeks after this case was filed, the District Attorneys of San Francisco and Los Angeles filed a joint action alleging that Uber charged a bogus "Airport Fee Toll" to riders traveling to San Francisco International airport. *The People of the State of California v. Uber Technologies, Inc.*, San Francisco Superior Court, Case No. CGC-14-543120.

6.      At all relevant times, Uber represented that when passengers were charged an "Airport Fee Toll," that fee is "to compensate drivers for any airport fees they are charged as part of your trip." https://support.uber.com/hc/en-us/articles/201836666-What-is-this-charge-for-a-toll-

7.      In addition to the Massport Surcharge, Uber charges an "East Boston Toll" to passengers traveling through East Boston. The toll that UberX vehicles pay for the East Boston toll is $3.50. Uber charges passengers $5.25, however, pocketing the inflated portion of this toll.

8.      This class action seeks declaratory, injunctive and monetary relief on behalf of a class of Uber passengers in Massachusetts who paid these fictitious and inflated fees.

**Parties**

9.      Ms. Nunez is an adult residing in Suffolk County.

10.     Ms. Cullinane is an adult residing in Suffolk County.

11.     Ms. Schaul is an adult residing in Middlesex County.

12.     Mr. McDonagh is an adult residing in Suffolk County.

13.     Uber Technologies, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

**Jurisdiction and Venue**

14.     This class action was filed in Superior Court in November 2014. Uber removed it to this Court under the Class Action Fairness Act. The Plaintiffs' remand motion is pending.

15.     Venue lies here because the Plaintiffs reside here and Uber does business here.

**Facts**

**Uber's Download And Registration Process Obscures The Terms & Conditions Uber Imposes On Its Customers**

16.     Ms. Nunez downloaded the Uber app on her iPhone and created an Uber account on or about January 1, 2013.

17.     Ms. Cullinane downloaded the Uber app on her iPhone and created an Uber account on or about April 1, 2014.

18.     Ms. Schaul downloaded the Uber app on her iPhone and created an Uber account before December 2013.

19.     Mr. McDonagh downloaded the Uber app on his iPhone and created an Uber account on or about January 10, 2014.

20.     Each of the Plaintiffs followed the registration process to create an Uber account. This process required each Plaintiff to input identifying information on a screen on their mobile device, and provide a credit card account number.

21.     On touchscreen devices like the iPhone an electronic keyboard obscures the lower half of the screen as information is inputted into each required field: email address, mobile telephone number, password, first and last name, and credit card account information.



22.     As each Plaintiff provided the information in the required fields,

the lower halves of their screens were obscured by the electronic keyboard.



23.     At the conclusion of the registration process, the app displayed a

screen to each Plaintiff, the bottom of which referenced a hyperlink to Uber's

"Terms & Conditions and Privacy Policy."



24.     At no step during the registration process were the referenced "terms & conditions" displayed to the Plaintiffs.

25.     Nor did Uber's registration process require, either as a condition of initially using its app or its ride share service, that any Plaintiff access the "terms & conditions" hyperlink, read the "terms & conditions," or affirmatively assent to them.

26.     No Plaintiff accessed the "terms & conditions" hyperlink, read the "terms & conditions," or affirmatively assented to them.

**Uber's Terms & Conditions Attempt To Abrogate Basic Legal Rights**

27.     Each prospective Uber user must register and create an Uber account using the same steps and viewing the same screens as Plaintiffs.

28.     Uber's inconspicuous "terms & conditions" contain a number of grossly one-sided provisions, which purport to contract away all possible legal obligations to its customers, including even any obligation to provide a safe vehicle, or a safe driver, while retaining its right to payment regardless of whether a ride is completed.

29.      Uber's "terms & conditions" contain a complete disclaimer of warranties, which disavows virtually every conceivable basis upon which a reasonable user would rely in using the app and the ride share service:

> The company makes *no representation, warranty, or guaranty* on the reliability, timeliness, quality, suitability, availability, accuracy or completeness of the service or application. ….

> The service and application is provided to you *strictly on an "as is" basis. All conditions, representations and warranties*, whether express, implied, statutory or otherwise, including, without limitation, any implied warranty of merchantability, fitness for a particular purpose, or non-infringement of third party rights, are *disclaimed to the maximum extent permitted by applicable law ….*
>
> You acknowledge and *agree that the entire risk* arising out of your use of the application and service, and any third party services or products *remains solely with you*, to the maximum extent permitted by law.

(Emphases added).

30.     Uber's "terms & conditions" contain a "no refund" policy, encompassing "[a]ny fees that the Company may charge you…." This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, *or any reason whatsoever*" (emphasis added).

31.     Uber's "terms & conditions" contain a Liability Disclaimer, by which Uber purports to absolve itself of all liability arising out of using its app or ride share service.

32.     Uber imposes upon every UberX passenger a $1 "Safe Rides Fee." Uber expressly represents that this Safe Rides Fee "supports our continued efforts to ensure the *safest possible platform for Uber riders* and drivers, including an *industry-leading background check* process, regular motor vehicle checks, driver safety education, development of *safety features in the app*, and insurance. For complete pricing *transparency*, you'll see this as a separate line item on every

UberX receipt" (emphases added).

33.     Despite its express representation that it is "committed to connecting you with the safest rides on the road," Uber disclaims "*any and all any liability… in any way related to the third party transportation provider…* " (emphasis added).

34.     Although it expressly represents that it employs an "*industry-leading background check* process," Uber disclaims any responsibility to "*assess the suitability, legality or ability of any [drivers]*" (emphases added).

35.     Although expressly representing that it conducts "regular motor vehicle checks [and] driver safety education," Uber's "terms & conditions" disavow any responsibility for the rider's safety: "*You understand*, therefore, that by using the application and the service, *you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe* or otherwise objectionable, and that *you use the application and the service at your own risk*" (emphases added).

36.     These are the terms and conditions that the Plaintiffs are ostensibly subject to by virtue of using the Uber app, regardless of their actual knowledge of and lack of affirmative assent to those terms.

**In Contrast, Uber Clearly Discloses Its Surge Pricing Terms And Requires Customers To Affirmatively Agree To Those Terms**

37.     In contrast to the passive "terms & conditions" disclosure, which does not require the customer's affirmative assent to those terms, Uber informs the customer before imposing any charges that surge pricing will be applied.

Uber discloses the amount of the surge pricing surcharge, and requires the customer to affirmatively agree to that surcharge before it acknowledges that an agreement on those terms has been reached between the customer and Uber.

38.     Uber's stated purpose for this multi-step process is that it wants to ensure that these contract terms are "clear and straightforward."

http://blog.uber.com/2012/12/28/surge2012/

39.     Uber illustrates this three step process on its website.

  

40.     By using this "clear and straightforward" disclosure process, coupled with requiring the customer's affirmative election to accept the disclosed terms, Uber hopes to ensure that, at least with respect to its surge pricing, its customers "won't be surprised" by the terms of its contract.

http://blog.uber.com/2012/12/28/new-years-eve-2012/#QA

**Facts Pertaining To Ms. Nunez's Uber Transaction**

41.     On September 13, 2013, Ms. Nunez used the Uber app to obtain

transportation to Logan Airport.

42.    Ms. Nunez paid $65.00 for the trip to the airport, including the

$8.75 "Massport Surcharge & Toll."

43.    Uber itemized its charges as follows on the electronic invoice it sent

to her via the app:



**Facts Pertaining To Ms. Cullinane's Uber Transaction**

44.    On June 29, 2014, Ms. Cullinane used the Uber app to obtain

transportation from Logan Airport.

45.    Ms. Cullinane paid $23.91 for the trip from the airport.

46.     Uber charged her for the $5.25 toll *plus* the $8.75 "Massport

Surcharge and Toll," as itemized on the electronic invoice it sent to her via the

app:



### Facts Pertaining To Ms. Schaul's Uber Transactions

47.     Elizabeth Schaul has used Uber to obtain transportation both to and

from Logan Airport on multiple occasions.

48.     For example, on October 5, 2014, Ms. Schaul used Uber to obtain a

ride from Logan Airport to Medford, Massachusetts.

49.     Ms. Schaul paid $28.55 for the trip from the airport.

50.    Uber charged her $5.25 for the East Boston toll *plus* the $8.75 "Massport Surcharge and Toll," as itemized on the electronic invoice it sent to her via the app:



51.    The UberX Ms. Schaul rode in was a non-commercial vehicle that was charged only $3.50 for the toll.

52.     Uber charged Ms. Schaul the $5.25 despite knowing that the actual toll was only $3.50.

53.    Uber reimburses its drivers for the actual tolls they pay, and

pockets the remainder of the $5.25 it charges passengers for the East Boston toll.

54.     Ms. Schaul was charged the Massport Surcharge on multiple other occasions, including but not limited to December 20, 2013, December 28, 2013, February 18, 2014, May 9, 2014, May 11, 2014, May 19, 2014, October 2, 2014, and December 1, 2014.

### Facts Pertaining To Mr. McDonagh's Uber Transactions

*$8.75 Massport Surcharge For Trips Not Involving Logan Airport*

55.     Ross McDonagh has used Uber to obtain transportation from South Boston to East Boston and back, not to Logan Airport, on multiple occasions.

56.     For example, on March 27, 2015, Mr. McDonagh used Uber to obtain a ride from South Boston to East Boston. He did not enter Logan Airport.

57.     Mr. McDonagh paid $37.46 for this trip, including an $8.75 Massport Surcharge.

58.     Mr. McDonagh was charged the Massport Surcharge on multiple other occasions, including but not limited to May 21, 2014, March 8, 2015, and March 24, 2015. On none of those occasions did he travel to or from Logan Airport.

*Charged $5.25 For $3.50 East Boston Toll*

59.     On February 19, 2015, Mr. McDonagh made the same trip in an UberX vehicle, and Uber charged him $5.25 for the East Boston toll, as itemized on the electronic invoice it sent to him via the app:



60.     The UberX Mr. McDonagh rode in was a non-commercial vehicle that was charged only $3.50 for the toll.

61.      Uber charged Mr. McDonagh the $5.25 despite knowing that the actual toll was only $3.50.

62.     Uber drivers who live in East Boston are entitled to pay only a 40 cent toll.

63.     Uber reimburses its drivers for the actual tolls they pay, and pockets the remainder of the $5.25 it charges passengers for the East Boston toll.

*$8.75 Massport Surcharge For Trips Involving Logan Airport*

64.     Mr. McDonagh has also used Uber to obtain transportation both to and from Logan Airport on multiple occasions and was charged the Massport Surcharge in each instance.

65.     For example, on July 11, 2014, and September 17, 2014, Mr. McDonagh traveled to Logan Airport and was charged the Massport Surcharge.

## Chapter 93A Demand And Response

66.     On November 6, 2014, Ms. Nunez and Ms. Cullinane sent a demand for relief to Uber pursuant to M.G.L. c. 93A, § 9, on behalf of themselves other similarly situated Uber customers.

67.     Uber responded through counsel on December 12, 2014, and declined to offer any relief to Plaintiffs or the class.

## Class Allegations

68.     At all relevant times, Uber's Boston website, https://www.uber.com/cities/boston, in a section entitled "The Fine Print," describes the $8.75 "Massport Surcharge": "[t]rips to or from Logan International Airport on UberX, UberBLACK, or UberSUV are subject to a [sic] $8.75 surcharge and any applicable tolls. Surcharge *covers Massport fees and other costs related to airport trips*" (emphasis added).

69.     The Rider Support section of Uber's website explains further that: "[i]n select cities, there may be a nominal fee to compensate drivers for any airport fees they are charged as part of your trip."

https://support.uber.com/hc/en-us/articles/201836666-What-is-this-charge-for-a-toll-

70.     UberX vehicles which are not licensed livery services and are not allowed to pick up passengers at Logan, nor are they charged a Massport fee of any sort for dropping passengers off at Logan.

71.     Those Uber vehicles which are licensed livery services or taxi services are only charged a $3.25 livery or $2.25 taxi fee if picking up at Logan, and no fees are assessed for drop-offs.

72.     At all relevant times, Uber represented on its website that "[s]ample tolls include $5.25 westbound toll for Sumner and Ted Williams tunnels." https://www.uber.com/cities/boston.

73.     The $5.25 toll is imposed only on commercial vehicles. UberX vehicles have non-commercial plates, and are charged a $3.50 toll.

74.     Most UberX vehicles have transponders, providing the user a fifty cent discount on each toll, making the actual tolls paid by transponder equipped non-commercial vehicles just $3.00.

75.     There are no "other costs related to airport trips" that Uber incurs on trips to or from Logan.

76.     Uber has imposed the fictitious "Massport Surcharge" upon hundreds of thousands of Logan-bound and outbound passengers, and continues to do so.

77.     Uber has imposed the inflated tolls upon hundreds of thousands of

Logan-bound and outbound passengers, as well as those passengers traveling through the East Boston tolls even if they are not Logan bound. It continues to do so.

78.    The class is composed of all Massachusetts residents who, since October 18, 2011:

(a)    paid an Uber invoice including an $8.75 charge designated as "Logan Massport Surcharge and Toll"; or

(b)    paid an Uber invoice including a $5.25 charge designated as "East Boston Toll"; and

(c)    have not received a refund of these charges for all amounts greater than the actual toll and any airport fee assessed by Massport or Logan Airport and paid by the Uber driver.

79.    Based on Uber's Logan Airport ride volume, the prospective class numbers in the hundreds of thousands, making joinder of all members impracticable. The exact size of the proposed class and the identity of the class members are readily ascertainable from Uber's business records.

80.    There are questions of law and fact common to the class, which predominate over any questions affecting only individual class members. The principal common issues with respect to the class include: whether Uber's "Massport Surcharge" and its retention of amounts in excess of the actual tolls and any charges actually imposed by Massport or Logan Airport constitute unjust enrichment; and whether these practices violate Chapter 93A.

81.    There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions,

other than those which can be determined by ministerial inspection of Uber's records, and the issues of liability are determinable entirely from the face of the operative documents.

82.     The Plaintiffs' class claims are typical of those of the class they seek to represent, and they will fairly and adequately protect and represent the interests of the class. There is no conflict between the Plaintiffs' claims as class representatives and the claims of the proposed class.

83.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. In addition, it is likely that most class members are unaware that they have claims. Finally, the prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against Uber.

84.     Plaintiffs are represented by counsel competent and experienced in both consumer protection and class action litigation.

## Causes Of Action

## Count I
## (Violations of Chapter 93A)

85.     By the misconduct complained of, Uber engaged in unfair and

deceptive acts and practices, in violation of M.G.L. c. 93A. As a result thereof,

Plaintiffs and class members have been damaged in an amount to be determined

at trial.

86.     Uber's unfair and deceptive practices include, without limitation:

    (a)    mislabeling the alleged Massport Surcharge to disguise its nature and imply that it is a government required fee when in fact it is not;

    (b)    engaging in deceptive pricing in violation of 940 C.M.R. 3.04, 3.13, *et seq.* by imposing fictitious fees;

    (c)    engaging in misrepresentations that have the capacity to deceive consumers, in violation of 940 C.M.R. 3.05, *et seq.*, including but not limited to misrepresenting  its commitment to ensuring the safest possible platform for Uber riders and drivers, performance of an industry-leading background check process, performance of regular motor vehicle checks, provision of driver safety education, and provision of complete pricing transparency;

    (d)    failing to disclose material facts, in violation of 940 C.M.R. 3.16; and

    (e)    imposing a fee without providing a corresponding service.

*Commonwealth v. DeCotis*, 366 Mass. 234, 241-243 (1974).

87.     Uber's actions described in this Complaint are willful or knowing,

or performed with reckless disregard of applicable law, all within the meaning of

M.G.L. c. 93A, § 9(3).

**Count II**
**(Unjust Enrichment)**

88.     By paying fictitious or inflated "Massport Surcharges" or tolls

Plaintiffs and class members unwittingly conferred economic benefits upon

Uber.

89.     Uber demanded and accepted these benefits, knowing that they

were undeserved.

90.     Uber's collection, acceptance and retention of fictitious or inflated

"Massport Surcharges" or tolls knowing that it was not entitled to them, is unjust

and inequitable.

91.     In equity and good conscience Uber should not be permitted to

retain these illegally obtained benefits.

**Prayer For Relief**

WHEREFORE, Plaintiffs respectfully pray for:

A.      an order certifying these claims as a class action;

B.      a declaration that Uber's conduct violates c. 93A, constitutes unjust

enrichment and that class members are entitled to a refund of all fictitious and

inflated charges imposed, with interest thereon, and to such additional remedies

as Chapter 93A and common law provide;

C.      statutory damages pursuant to c. 93A;

D.      multiple damages pursuant to c. 93A;

E.      attorneys' fees and costs;

F.      an order preliminarily and permanently enjoining Uber from

engaging in the practices challenged in this Complaint;

G.      pre-judgment interest to the extent permitted by law; and

H.      such other and further relief as the Court may deem just and

proper.

**Demand For Jury Trial**

Plaintiffs demand a trial by jury of all issues so triable.

August 4, 2015

Respectfully submitted,


*/s/ John Roddy*
John Roddy, BBO # 424240
Elizabeth Ryan, BBO # 549632
Bailey & Glasser LLP
99 High Street, Suite 304
Boston, MA 02110
(617) 439-6730
(617) 951-3954 (fax)

Pedro Jaile, BBO # 631410
Jaile & Trifilo LLC
188 Sumner Street
East Boston, MA 02128
(617) 561-3777
(617) 561-0300 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on August 4, 2015.

*/s/ John Roddy*
John Roddy