UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RACHEL CULLINANE, JACQUELINE NUNEZ, ELIZABETH SCHAUL, AND ROSS McDONAGH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) ) |
| v. | ) |
| | ) |
| UBER TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant. | ) |

CIVIL ACTION NO. 14-14750-DPW

MEMORANDUM AND ORDER
July 8, 2016

The practice of avoiding consumer class action litigation through the use of arbitration agreements is the subject of current scholarly disapproval[1] and skeptical investigative journalism.[2]  It appears that at least one agency of the federal government is considering regulating the use of such agreements in so far as the subject matter is within its jurisdiction.[3] Nevertheless, the legal foundation provided in Supreme Court

---

[1] *See generally*, Judith Resnik, *Diffusing Disputes, The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 Yale L.J. 2804 (2015).
[2] *See* Jessica Silver-Greenberg & Robert Gebeloff, *Arbitration Everywhere, Stacking the Deck of Justice*, N.Y Times, Nov. 1, 2015, at A1.
[3] Proposed Rules, Arbitration Agreements, 81 Fed. Reg. 32830-01, 2016 WL 2958777(F.R.) (May 24, 2016) (to be codified at 12 C.F.R. pt. 1040).

jurisprudence regarding the Federal Arbitration Act[4] for construction of arbitration agreements that bar consumer class actions is firmly embedded.  Even Justices who question the practice find themselves bound to adhere to the blueprint opinions the Court have provided.[5]

The plaintiff in this case extends an invitation to disassemble the judicial construct permitting a bar to class action litigation for consumer arbitration agreements.  The invitation suggests teasing out distinctions that truly make no difference.  This is not an institutionally authorized nor intellectually honest way to change practice and legal policy regarding the permissible scope of arbitration.  Change, if it is to come, must be effected by a refinement through legislation and/or regulation that imposes restrictions on arbitration agreements, or by a reversal of direction on the part of the Supreme Court.  It is not within the writ of the lower courts to

---

[4] *See generally AT&T Mobility LLC* v. *Concepcion,* 563 U.S. 333 (2013).

[5] *See DirecTV, Inc.* v. *Imburgia*, 136 S.Ct. 463 (2015).  Justice Breyer, the author of *DirectTV* also wrote the principal dissent in *Concepcion*, where he was joined by Justices Ginsburg, Sotomayor and Kagan.  In *DirectTV*, he observed that "[n]o one denies that lower courts must follow this Court's holding in *Concepcion*.  The fact that *Concepcion* was a closely divided case, resulting in a decision from which four Justices dissented, has no bearing on that undisputed obligation."  *Id*. at 468.  Justice Breyer was again joined by Justice Kagan in his majority opinion in *DirectTV*; Justices Ginsburg and Sotomayor, however, remained in dissent.  *Id*. at 471.

replot the contours of arbitration law when the metes and bounds have been set clearly, unambiguously and recently by the Supreme Court.

The plaintiffs in this putative class action are a group of users of the ride-sharing phone application designed and managed by defendant Uber Technologies.  They allege that Uber overcharged them for travel to and from Boston Logan Airport and East Boston by imposing fictitious fees hidden in charges for legitimate local tolls.  The plaintiffs seek class action relief pursuant to Mass. Gen. Laws ch. 93A, § 9, and accuse Uber of unjust enrichment.  In response, Uber has filed the motion before me, seeking to compel arbitration of the dispute pursuant to 9 U.S.C. § 1 *et seq*, also known as the Federal Arbitration Act ("FAA").  I will allow that motion and dismiss this case.

## I. BACKGROUND

### A.   *Factual Background*

#### 1.   The Parties

Uber Technologies ("Uber") is a ride-sharing service that transports customers throughout Boston for a fee.  [2d Am. Compl., Doc. 54 ¶ 1]  Uber's customers call for Uber vehicles, and pay for the requested ride, through use of Uber's smartphone app.  [*Id.* ¶ 1]

The named plaintiffs seek to represent a class of customers of Uber residing in Suffolk and Middlesex Counties,

Massachusetts.  [*Id.* ¶¶ 9-13]  Each downloaded the Uber
application and created an account at some point from 2012 to
2014.  [*Id.* ¶¶ 16-19; Doc. 34 ¶¶ 7-10]  Plaintiff Jacqueline
Nunez used the app to hail a ride from Logan Airport on
September 13, 2013, and was charged an $8.75 "Massport Surcharge
and Toll" ("Surcharge").  [*Id.* ¶¶ 41-42]  Plaintiff Rachel
Cullinane used the Uber app to call a ride from Logan Airport on
June 29, 2014, and was charged a $5.25 toll and the $8.75
Surcharge.  [*Id.* ¶¶ 44-46].  Plaintiff Elizabeth Schaul used
Uber to obtain transportation to and from Logan airport on
numerous occasions between December 20, 2013 and December 1,
2014, and alleges that, each time, she was charged for an
inflated toll and the Surcharge.  [*Id.* ¶¶ 47-54]  Plaintiff Ross
McDonagh has used Uber to hail taxis to and from East Boston and
Logan Airport, and alleges that he was charged the Surcharge and
other fees multiple times between May 21, 2014 and March 27,
2015.  [*Id.* ¶¶ 55-65].  The named plaintiffs purport to
represent a putative class of plaintiffs composed of all
Massachusetts residents who, since October 18, 2011, have been
charged either the allegedly inflated toll fees or the
Surcharge.  [*Id.* ¶ 78]

    2.   <u>Account Creation Process</u>

    In order to use the Uber application to call for
transportation, users must first create an account, either

through Uber's website, or through its smartphone app.  [Doc. 32-1 ¶ 4]  Each plaintiff created his or her account through the smartphone app.  [Doc. 54 ¶¶ 16-19; Doc. 32-1 ¶¶ 7-10]

In order to create an account, a user must proceed through three steps, each with its own screen inside the smartphone app. [Doc. 32-1 Ex. A-D]  The first screen, entitled "Create an Account", prompts the user to input an e-mail address and mobile phone number, and to create a password for the account she is attempting to create.  [Doc. 32-1 Ex. A-1, B-1, C-1, D-1]  This screen also contains gray text on a black background immediately below the blank white input boxes and above the phone keyboard that says, "We use your email and mobile number to send you ride confirmations and receipts."  [*Id.*]

A second screen, entitled "Create a Profile", prompts users to enter their first and last names and to submit a photograph. [Doc. 32-1 Ex. A-2, B-2, C-2, D-2]  This screen contains gray text on a black background that says, "Your name and photo helps [sic] your driver to identify you at pickup".  [*Id.*]  This text is in the same location as the gray text from the previous screen.

The third and final screen in the account creation process, entitled "Link Payment", prompts the user to enter a credit card number to link a card to ride requests for payment.  [Doc. 32-1 Ex. A-3, B-3, C-3, D-3, D-4].  In the most recent version of the

screen, a version only used by Mr. McDonagh, this screen also provides an option to link a Paypal account in lieu of a credit card. [Doc. 32-1 Ex. D-3]. Immediately below the credit card information input box, and above the keyboard, appear the words "By creating an Uber account, you agree to the Terms of Service & Privacy Policy". [Doc. 32-1 Ex. A-3, B-3, C-3, D-3, D-4] The words "Terms of Service & Privacy Policy" appear in bold white lettering on a black background, and are surrounded by a gray box, indicating a button. [*Id.*; Doc. 32-1 ¶ 15] The other words are in gray lettering. [*Id.*] If a user clicks the button that says "Terms of Service & Privacy Policy", the Terms of Service then in effect are displayed on the phone. [Doc. 32-1 ¶ 15].

After entering payment information, the user must then click a button with the word "Done" in the top-right-hand corner of the screen in order to create an account. [Doc. 32-1 Ex. A-3, B-3, C-3, D-3, D-4; Doc. 32-1 ¶ 15] This button is grayed out and unclickable until the user enters her payment information. [Doc. 32-1 Ex. A-3, B-3, C-3, D-3, D-4] Users must complete all of the information requested in the input boxes on each screen and click the "Done" button on the last screen in order to create an account. [Doc. 32-1 ¶ 15].

### 3. Uber Terms and Conditions

The Uber Terms & Conditions ("Agreement") are contained in

a 10-page document available to users who click on the box
containing the phrase "Terms of Service & Privacy Policy" on the
final screen of the account creation process.  [Doc. 32-6 Ex. A-
B, 32-1 ¶ 15]  The Agreement contains many headings, each of
which lays out certain terms of use for users of Uber's app.
[Doc. 32-6 Ex. A-B]  Uber changed its Agreement on May 17, 2013.
[Doc. 32-6 Ex. B]  As a result, the Agreement that Ms. Nunez
would have seen had she clicked on the button on the last screen
(nothing in the complaint indicates than any of the plaintiffs
did click through) would have taken her to a different document
than that available to the other plaintiffs.  [Doc. 32-6 ¶¶ 4-5]
However, the only relevant difference between the two documents
is that the earlier Agreement had slightly larger headings for
each section.  [Doc. 32-6 Ex. A-B]

     The Agreement states that it "constitute[s] a legal
agreement between [user] and Uber. . . .  In order to use the
Service [] and the associated Application [], you must agree to
the terms and conditions that are set out below."  [Doc. 32-6
Ex. A-B at 1]  The contract also states that, by using any of
Uber's services, the user "expressly acknowledge[s] and agree[s]
to be bound by the terms and conditions of the Agreement."
[*Id.*]

     The Agreement contains a section starting on page 9 (page 8
of the newer agreement) under the heading "Dispute Resolution."

[Doc. 32-6 Ex. A at 9-10; Doc. 32-6 Ex. B at 8-10].  This
section provides that the user and Uber

> agree that any dispute, claim or controversy arising
> out of or relating to this Agreement or the breach,
> termination, enforcement, interpretation or validity
> thereof or the use of the Service or Application
> (collectively, "Disputes") will be settled by binding
> arbitration, except that each party retains the right
> to bring an individual action in small claims court. .
> . .  **You acknowledge and agree that you and Company
> are each waiving the right to a trial by jury or to
> participate as a plaintiff or class User in any
> purported class action or representative proceeding.**
> Further, unless both you and Company otherwise agree
> in writing, the arbitrator may not consolidate more
> than one person's claims, and may not otherwise
> preside over any form of any class or representative
> proceeding.

[Doc. 32-6 Ex. A-B at 9] (emphasis in original).  Under a
sub-heading entitled "Arbitration Rules and Governing Law", the
Agreement states, "The arbitration will be administered by the
American Arbitration Association ("AAA") in accordance with the
Commercial Arbitration Rules and the Supplementary Procedures
for Consumer Related Disputes (the "AAA Rules") then in effect.
. . .  The Federal Arbitration Act will govern the
interpretation and enforcement of this section." [*Id.*]  The
Agreement also provides that, should a user's claim be for an
amount under $75,000, Uber will pay any arbitration-related
fees. [*Id.*]

**B.   *Procedural History***

Plaintiffs Cullinane and Nunez, on behalf of themselves and

a putative class, filed this case in Massachusetts Superior Court. [Doc. 1-1, Original Complaint]  The Original Complaint alleged five causes of action, four of which contained contract-related claims that have since been dropped by plaintiffs.  [*Id* ¶¶ 52-63]  The fifth claim was the remaining claim of unjust enrichment.  [*Id.* ¶¶ 60-63]

Uber removed the case to this Court pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d).  Plaintiffs responded with a motion to remand to State Court for lack of subject matter jurisdiction, claiming that Uber had not shown that this dispute would meet CAFA's amount in controversy requirement of $5 million.  I denied that motion.

Plaintiffs have successively filed two amended complaints. The first amended complaint added Schaul and McDonagh as named plaintiffs, and added the East Boston toll (experienced by Mr. McDonagh) claim to the claims based on the Surcharge.  The plaintiffs also added a sixth count to their complaint, alleging that the hidden charges constitute unfair and deceptive acts in violation of Chapter 93A of the Massachusetts General Laws.  The plaintiffs thereafter filed a Second Amended Class Action Complaint, which is currently the operative complaint, dropping the counts based on breach of contract, leaving only a Chapter

93A claim (Count I)[6] and a common law unjust enrichment claim (Count II). [Doc. 54, ¶¶ 85-91].

For its part, Uber filed a motion to compel arbitration and stay or, in the alternative, to dismiss.  The threshold question whether arbitration must be compelled will be addressed in this Memorandum.  Because I conclude the answer to that question is "yes," it is for the arbitration tribunal to determine the merits of the claim.  Since arbitration must be compelled and nothing else remains for resolution in this court at this time, I will dismiss the case upon the order to compel arbitration.

## II. STANDARD OF REVIEW

A party seeking to compel arbitration "must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  *Soto-Fonalledas* v. *Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011).  Section 2 of the FAA provides that an arbitration clause in a written contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

---

[6] Specifically, plaintiffs allege that Uber's actions violate MASS. GEN. LAWS ANN. Ch. 93A (West 2015), 940 MASS. CODE REGS. 3.04 (2015), 940 MASS. CODE REGS. 3.05 *et seq.* (2015), 940 MASS. CODE REGS. 3.13 *et seq.* (2015), and 940 MASS. CODE REGS. 3.16 (2015).

### III. ANALYSIS

**A.** *Validity of the Agreement*

    1.   Contract Formation

In order to assess whether or not the claims raised by plaintiffs should be resolved by arbitration, I must first address the question "whether . . . there exists a written agreement to arbitrate." *Lenfest* v. *Verizon Enter. Solutions, LLC*, 52 F. Supp. 3d 259, 262-63 (D. Mass. 2014). This is the first step of the analysis because, if the contract containing the arbitration agreement was never binding on the plaintiffs, the arbitration clause cannot be enforced against them.

It is fundamental in addressing challenges to arbitration agreements to recognize that "arbitration is a matter of contract." *Rent-A-Center, West, Inc.* v. *Jackson*, 561 U.S. 63, 67 (2010). "The FAA thereby places arbitration agreements on an equal footing with other contracts . . . and requires courts to enforce them according to their terms." *Id.* at 67-68 (internal citations omitted). However, it is similarly bed rock that the savings clause of § 2 of the FAA preserves "generally applicable contract defenses," as long as those defenses do not "stand as an obstacle to the accomplishment of the FAA's objectives." *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 131 S.Ct. 1740, 1748 (2011).

In analyzing any possible contractual defenses to the formation of the agreement, "[t]he interpretation of an arbitration agreement is [] generally a matter of state law." *Tompkins* v. *23andMe, Inc.*, No. 5:13-cv-05682-LHK, 2014 WL 2903752, at *4 (N.D. Cal. June 25, 2014).  In Massachusetts, "courts may apply generally applicable State-law contract defenses . . . to determine the validity of an arbitration agreement."  *St. Fleur* v. *WPI Cable Systems/Mutron*, 450 Mass. 345, 349-350, 879 N.E.2d 27, 31 (2008).

In online adhesion contracts, the analysis under Massachusetts law is the same as in most courts around the country that have analyzed issues similar to this one.  When it comes to specific clauses in adhesion contracts, under Massachusetts law, courts "have held that such clauses will be enforced provided they have been reasonably communicated and accepted and if, considering all the circumstances, it is reasonable to enforce the provision at issue."  *Ajemian* v. *Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 573-74, 987 N.E.2d 604, 611 (2013).  While *Ajemian* analyzed the enforcement of forum selection and limitations clauses, the analysis is the same here.  The basic inquiry as to enforceability boils down to basic contract theory of notice and informed assent with respect to the terms in question.

2.    Types of Online Adhesion Agreements

In this case, the defense to contract formation asserted by the plaintiffs is lack of notice of or assent to the terms of the Agreement.  Plaintiffs argue that the Agreement is an online "browsewrap" adhesion contract.  The defendants maintain that the Agreement and its place in the account creation process is more akin to a "clickwrap" agreement, and call it a "hybrid" agreement.  I do not find such summary descriptions of detailed agreements particularly helpful to meaningful analysis.  Rather, in order better to explain the differences between various types of online "wrap" agreements, I will provide a few pages of history.

The "wrap" contract terminology began with the advent of the "shrinkwrap" agreement.  "The 'shrinkwrap license' gets its name from the fact that retail software packages are covered in plastic or cellophane 'shrinkwrap', and some vendors . . . have written licenses that become effective as soon as the customer tears the wrapping from the package."  *ProCD, Inc.* v. *Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996).  Although it was not always the case, courts now generally enforce shrinkwrap agreements "on the theory that people agree to the terms by using the [product] they have already purchased."  Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 459-60.  While shrinkwrap agreements, as the name suggests, formally apply only

to tangible goods, agreements entered into online for both tangible goods and intangible goods and services have developed a body of terminology that borrows the word's suffix.

"Browsewrap" agreements or licenses are those in which "the user does not see the contract at all but in which the license terms provide that using a Web site constitutes agreement to a contract whether the user knows it or not." *Lemley*, 91 Minn. L. Rev. at 460. Browsewrap agreements have been characterized as those "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it." *Nguyen* v. *Barnes & Noble, Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Normally, in a browsewrap agreement, "the website will contain a notice that — merely by using the services of, obtaining information from, or initiating applications within the website — the user is agreeing to and is bound by the site's terms of service." *United States* v. *Drew*, 259 F.R.D. 449, 462 n. 22 (C.D. Cal. 2009).

By contrast, a "clickwrap" agreement is an online contract "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Nguyen*, 763 F.3d at 1175-76. Courts view the clicking of an "I agree" or "I accept" box (or similar mechanism) as a requirement that "the user manifest assent to the terms and

conditions expressly" before she uses the website or services covered by the agreement. *Id.* (citing *Hines* v. *Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366-67 (E.D.N.Y. 2009). Clickwraps differ from browsewraps with respect to their enforceability under contract principles because, "[b]y requiring a physical manifestation of assent, a [clickwrap] user is said to be put in inquiry notice of the terms assented to." *Berkson* v. *Gogo LLC*, No. 14-CV-1199, 2015 WL 1600755, *28 (E.D.N.Y. 2015). Clickwrap agreements permit courts to infer that the user was at least on inquiry notice of the terms of the agreement, and has outwardly manifested consent by clicking a box. As a result, "[b]ecause the user has 'signed' the contract by clicking 'I agree,' every court to consider the issue has held clickwrap licenses enforceable." *Lemley*, 91 Minn. L. Rev. at 466.

In *Berkson*, Judge Weinstein coined a new phrase, "sign-in-wrap", to describe certain online agreements that fall between a browsewrap and a clickwrap. "*Sign-in-wrap* couples assent to the terms of a website with signing up for use of the site's services." *Berkson*, 2015 WL 1600755 at *25. In a sign-in wrap, a user is presented with a button or link to view terms of use. It is usually not necessary to view the terms of use in order to use the web service, and sign-in-wrap agreements do not have an "I accept" box typical of clickwrap agreements. Instead, sign-in-wrap agreements usually contain language to the effect that,

by registering for an account, or signing into an account, the user agrees to the terms of service to which she could navigate from the sign-in screen.

### 3.   Uber's Agreement

For purposes of analyzing the Agreement found in the Uber sign-up process, I will adopt Judge Weinstein's taxonomy and refer to the Uber Agreement as a sign-in-wrap agreement. Nevertheless, analysis of the Agreement's validity and enforceability turns more on customary and established principles of contract law than on newly-minted terms of classification.  "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc*. v. *Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).  "Mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Specht* v. *Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002).

Massachusetts courts have not yet had much opportunity to analyze online wrap agreements.  However, in *Ajemian*, the Appeals Court made clear that the analysis in Massachusetts is the same as it is elsewhere in the jurisprudence of contract enforcement.  Although the clauses sought to be enforced in *Ajemian* were a forum selection clause and a limitations clause, the essential question presented was the same: what level of

16

notice and assent is required in order for a court to enforce an online adhesion contract?  The *Ajemian* court turned to "the modern rule of reasonableness," and observed that clauses in online consumer agreements "will be enforced provided they have been reasonably communicated and accepted and if, considering all the circumstances, it is reasonable to enforce the provision at issue." *Ajemian*, 83 Mass. App. Ct. at 573.  The party seeking to enforce the contract has "the burden of establishing, on undisputed facts, that the provisions of the TOS ["Terms of Service"] were reasonably communicated and accepted." *Id.* at 574.  This requires "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers." *Specht*, 306 F.3d at 35.  The *Ajemian* court specifically concluded that the agreement before it was essentially a browsewrap agreement, and that the notice provided to the users was insufficient to justify enforcement of the clauses in question.  Nevertheless, the *Ajemian* analysis of contract formation in the online adhesion contract context remains instructive generally regarding the Massachusetts approach to such agreements.

In analyzing online agreements, the Second Circuit has used the analogy of a roadside fruit stand displaying bins of apples; these apples have a sign above them displaying the price of the apples for potential consumers.  *See Register.com*, 356 F.3d at

17

401.  Judge Holwell, analyzing a sign-in-wrap-style agreement in *Fteja* v. *Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012), refined this analogy further.  "For purposes of this case, suppose that above the bins of apples are signs that say, 'By picking up this apple, you consent to the terms of sales by this fruit stand.  For those terms, turn over this sign.'" *Fteja*, 841 F. Supp. 2d at 839.  Judge Holwell observed that courts around the country, supported by established Supreme Court reasoning in *Carnival Cruise Lines, Inc.* v. *Shute*, 499 U.S. 585, 111 S.Ct. 1522 (1991), would not hesitate to enforce such a contract.  In holding that the online sign-in-wrap agreement was enforceable, Judge Holwell wrote, "[T]here is no reason why that outcome should be different because Facebook's Terms of Use appear on another screen rather than another sheet of paper." *Fteja*, 841 F. Supp. 2d at 839.  I agree.

a.   *Reasonable Notice of Binding Contract*

The process through which the plaintiffs established their accounts put them on reasonable notice that their affirmative act of signing up also bound them to Uber's Agreement.  Whether or not plaintiffs had *actual* notice of the terms of the Agreement, all that matters is that plaintiffs had *reasonable* notice of the terms.  "In Massachusetts courts, it has long been the rule that '[t]ypically, one who signs a written agreement is bound by its terms whether he reads and understands them or

18

not.'"   *Awuah* v. *Coverall N. Am., Inc.*, 703 F.3d 36, 44 (1st Cir. 2012) ("*Awuah II*") (quoting *St. Fleur* v. *WPI Cable Systems/Mutron*, 450 Mass. 345, 355, 879 N.E.2d 27, 35 (2008)). The placement of the phrase "By creating an Uber account, you agree to the Terms of Service & Privacy Policy" on the final screen of the account registration process is prominent enough to put a reasonable user on notice of the terms of the Agreement.  Although the paragraph under the heading of "Dispute Resolution" does not appear until the 8th or 9th page (depending on when a user accessed it), the heading is in bold and much larger than the non-heading text in the rest of the Agreement. A reasonable user who cared to pursue the issue would have inquiry notice of the terms of the Agreement challenged by the plaintiffs.

The plaintiffs rely heavily on Judge Weinstein's decision in *Berkson*, where he ultimately found the notice provided to the plaintiffs in a sign-in-wrap situation to be insufficient.  The first step of Judge Weinstein's four-part analysis of such adhesion contracts suggests that actual notice must be found on the basis of "substantial evidence from the website that the user was aware that she was binding herself to more than an offer of services or goods in exchange for money."  *Berkson*, 2015 WL 1600755 at *33.  That step, however, obliquely disregards the customary contract analysis applied by the vast

majority of courts.[7]  More pertinently, it runs contrary to the
test in Massachusetts, articulated in *Ajemian*.  A test requiring
a showing by the offeror of actual notice of the offeree
virtually insures a fact intensive analysis in every case and —
as a practical matter — would, through the imposition of such
transactions costs for the contract validation process, make
otherwise legally compliant arbitration agreements for online

---

[7] *See, e.g. Defillipis* v. *Dell Fin. Servs.*, No. 3:14-CV-00115,
2016 WL 394003 (M.D. Pa. Jan. 29, 2016) (finding that a blue
hyperlink leading to terms and conditions available next to a
box a customer had to click in order to sign up for an account
was sufficient to provide notice to the customer), *Whitt* v.
*Prosper Funding, LLC*, No. 1:15-cv-136-GHW, 2015 WL 4254062 at *5
(S.D.N.Y. July 14, 2015) (pointing out that the plaintiff was
not able to cite "authority indicating that a reasonably prudent
website user lacks sufficient notice of terms of an agreement
that are viewable through a conspicuous hyperlink," and noting
that there is "an abundance of persuisavie authority . . .
supporting a proposition to the contrary.").
   The plaintiff suggests that the holding in *Sgouros* v.
*TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016), embodies a
different and more demanding approach.  There, the Seventh
Circuit found that a credit score agency's website did not
provide notice to its customers sufficient to enforce the
arbitration clause found in its terms of service.  But in that
case, "TransUnion's site actively misleads the customer" because
the "Accept" box that users are required to click only mentions
collection of personal data, not consent to the "Terms and
Conditions" that include the arbitration clause.  *Sgouros*, 817
F.3d at 1035.  The Court observed that companies could provide
sufficient notice by "placing the agreement . . . or a clearly
labeled hyperlink to the agreement, next to an 'I Accept' button
that unambiguously pertains to that agreement" in the sign-up
process.  *Id*. at 136.  That is what Uber provided to the
plaintiffs and thus *Sgouros* does not advance the plaintiffs'
claims.

contracts all but impossible to enforce.[8]  Erosion of the
substance of current arbitration rules, by contortion of means
for their enforcement, makes those substantive rules illusory.
That is not the rule in the majority of jurisdictions; and, in
particular, it is not the rule in Massachusetts.  The test to be
applied in Massachusetts is reasonable notice.  The documents
properly before me on this motion[9] establish that Uber has
demonstrated that plaintiffs were given such notice.

> b.   *Manifested Agreements*

Although the plaintiffs were given reasonable notice, in
order to enforce the Agreement, Uber must also show that the
plaintiffs necessarily manifested agreement to the terms.  To
return to the apple analogy, in the Uber sign-up process,
clicking "Done" and ordering the app is akin to the apple eater
taking a bite of the apple.  Although an even more "unambiguous
manifestation of consent," *Specht*, 306 F.3d at 35, might be for
the apple eater also to check a box on a piece of paper next to

---

[8] One estimate is that only "one in a thousand" consumers
actually reads such contracts, and, thus, can be said to have
actual notice of their terms.  Alina Tugend, *Those Wordy
Contracts We All So Quickly Accept*, N.Y. Times, July 12, 2013,
at B6.

[9] In this connection, I may consider documents such as the
operative agreement incorporated by reference in the complaint.
*Carter's of New Bedford, Inc.* v. *Nike, Inc.* 2014 WL 1311750 at
*2 (D. Mass. Mar. 31, 2014).

the words, "I accept the terms on the other side of the sign above the apple basket," one bite of the apple is enough.[10]

The language surrounding the button leading to the Agreement is unambiguous in alerting the user that creating an account will bind her to the Agreement.  And the word "Done," although perhaps slightly less precise than "I accept," or "I agree," makes clear that by clicking the button the user has consummated account registration, the very process that the notification warns users will bind them to the Agreement.

### c.   Conclusion

I conclude that the Agreement is a valid contract that is enforceable against the plaintiffs.

## B.   *Enforceability of the Arbitration Clause*

Having decided that the Agreement is generally valid and enforceable against the plaintiffs, I must now determine whether the specific arbitration clause is valid.  The question is "whether the parties agreed to arbitrate [this] dispute.  The

---

[10] In making use of this appetizing metaphor, rooted in case law generated by judges from New York, *Register.com, Inc*. v. *Verio, Inc.*, 356 F.3d 393, 401 (2d Cir. 2004); *Fteja* v. *Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012), I remain mindful of then Judge Cardozo's warning to New York lawyers that "[m]etaphors in the law are to be narrowly watched, for starting as ways to liberate thought, they end often by enslaving it." *Berkey* v. *Third Ave. Ry. Co.*, 244 N.Y. 84, 94 (1926).  That acknowledged, however, I am satisfied the metaphor retains nutritional value as food for thinking about how conduct may manifest acceptance of an offer.

court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [Federal Arbitration] Act." *Mitsubishi Motors Corp* v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353 (1985) (citations omitted). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 941 (1983).  With respect to the sometimes thorny gateway issue of arbitration jurisdiction, "where the parties have themselves clearly and unmistakably agreed that the arbitrator should decide whether an issue is arbitrable, the Supreme Court has held that this issue is to be decided by the arbitrator. . . .  [T]he validity of an arbitration clause is itself a matter for the arbitrator where the agreement so provides." *Awuah* v. *Coverall North America, Inc.*, 554 F.3d 7, 10-11 (1st Cir. 2009) ("*Awuah I*").

In *Awuah I*, the First Circuit considered whether or not arbitration was an appropriate remedy for a dispute between multiple franchisees and Coverall, the franchisor.  The arbitration agreement in question was as broad as the one at issue in this case:

> all controversies, disputes or claims between Coverall
> . . . and Franchisee . . . arising out of or related
> to the relationship of the parties, this Agreement,

23

any related agreement between the parties, and/or any
specification, standard or operating procedure of
Coverall . . . shall be submitted promptly for
arbitration. . . .  Unless otherwise provided or the
parties agree otherwise, arbitration shall be in
accordance with the then current Rules of the American
Arbitration Association.

*Awuah I*, 554 F.3d at 9.

As Judge Boudin observed for the court, the Rules of the
AAA include Rule 7(a), which provides, in relevant part, "The
arbitrator shall have the power to rule on his or her own
jurisdiction, including any objections with respect to the
existence, scope, or validity of the arbitration agreement or to
the arbitrability of any claim or counterclaim."  American
Arbitration Association Commercial Arbitration Rules and
Mediation Procedures Rule 7(a) (American Arbitration Association
2013).  The First Circuit concluded that, where arbitration
agreements unmistakably incorporate AAA rules (in particular
Rule 7(a)), it is left to the arbitrator to decide what issues
are arbitrable, and, further, to decide such defenses to
arbitration clauses as unconscionability.

Once a court decides that the arbitration clause is broad
enough to encompass the issues in dispute and that the parties
agreed to have the contract governed by the AAA Rules, it must
compel arbitration.  To be sure, an exception was recognized by
the *Awuah I* court.  That exception applies to cases in which the
arbitration itself may "be an illusory remedy.

In principle, having the arbitrator decide questions of validity is required if the parties so agreed; but if the terms for getting an arbitrator to decide the issue are impossibly burdensome, that outcome would indeed raise public policy concerns." *Awuah I*, 554 F.3d 7 at 12.  In such cases, it is up to the court to determine if arbitration would be an illusory remedy under the circumstances.  The First Circuit in *Awuah I* ultimately remanded the case for the district court to determine whether or not arbitration was an illusory remedy in that case. In doing so, it gave guidance for analysis of whether or not arbitration is an illusory remedy.  The inquiry focuses on

> whether the arbitration regime here is structured so
> as to *prevent* a litigant from having access to the
> arbitrator to resolve claims, including
> unconscionability defenses.  The standard for such a
> showing of illusoriness would also be high — all
> formal dispute resolution involves costs and
> inconvenience.  But if the remedy is truly illusory, a
> court should not order arbitration at all but decide
> the entire dispute itself."

*Id.* at 13 (emphasis in original).

In defining what makes arbitration an "illusory" remedy, the First Circuit in *Awuah I* noted that "excessive arbitration costs" are a significant concern.  *Id.* at 13.  *Awuah I* does not define precisely what "excessive" costs may be, but, with respect to Uber's Agreement before me, this is not necessary. Uber explicitly states in the Agreement that it will bear the costs of any arbitration claim under $75,000, thereby relieving

any potential plaintiff of bearing the cost of arbitration unless her claim is substantial.

It might be argued that waiver of the right to bring a class action also renders dispute resolution terms illusory. But Supreme Court precedent is clear that "[c]lass arbitration waivers are enforceable even where the cost of individual arbitration effectively prevents the pursuit of low-value claims" that would only be financially viable in a class context. *Pazol* v. *Tough Modder, Inc.*, 100 F. Supp. 3d 74, 76 (D. Mass. 2015), *rev'd on other grounds*, 819 F.3d 548 (1st Cir. 2016), (*citing Am. Express Co.* v. *Italian Colors Rest.*, 133 S.Ct. 2304 (2013)). Thus, so-called forced "single-file" arbitration is not a bar to arbitration agreements generally. It follows that objection to "single-file" arbitration is no basis for a contention that arbitration is an illusory remedy.[11]

Having concluded that arbitration is not an illusory remedy for the plaintiffs, I must leave all other issues to the

---

[11] I must, however, register my agreement with Justice Breyer's characteristically practical assessment that "nonclass arbitration over [small sums] will [] sometimes have the effect of depriving claimants of their claims." *Concepcion*, 563 U.S. at 365 (Breyer, J., dissenting). This is because, as Judge Posner has observed with characteristic pungency, "the *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30". *Id.* (quoting *Carnegie* v. *Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original)).

arbitrator to decide, including the claim of unconscionability. The language of the Agreement and the case law are clear: when, as I found, the parties agreed to arbitrate; when, as I have concluded, the dispute falls within the scope of the arbitration provision; and when, as here, arbitration is not an illusory remedy, the court must compel arbitration, and leave all other matters for the arbitrator to decide.

## C.    *Stay or Dismiss*

The remaining question is whether to stay this case or to dismiss it.

> Section 3 of the FAA requires that where issues brought before a court are arbitrable, the court shall stay the trial of the action until such arbitration has been had in accordance with the terms of the [arbitration] agreement.  However, a court may dismiss, rather than stay, a case when all of the issues before the court are arbitrable.

*Bercovitch* v. *Baldwin School, Inc.*, 133 F.3d 141, 156 n. 21 (1st Cir. 1998) (citations omitted).  Having determined in resolving the instant motion that all further issues shall be decided by the arbitrator, nothing remains for me to decide.  A stay is unnecessary to await further developments.  Consequently, I will dismiss the case, with recognition that as a collateral aspect of that disposition, this decision is immediately appealable to

permit plaintiffs a timely opportunity to challenge it if they so choose.[12]

## IV. CONCLUSION

For the reasons set forth above, I GRANT the defendant's Motion to Compel Arbitration [Dkt. No. 31] and direct the Clerk to dismiss the case.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[12] *See Green Tree Financial Corp.-Alabama* v. *Randolph*, 531 U.S. 79, 87, 121 S.Ct. 513, 520 n. 2 (2000) (noting that a district court's decision to dismiss a case was a "final decision within the meaning of § 16(a)(3) [of the FAA], and an appeal may be taken," and that, "Had the District Court entered a stay instead of a dismissal in this case, that order would not be appealable" under § 16(b)(1).)